. Opinion of the Court—Thayer, J.

[Filed April 13, 1885.]

# SAMUEL ARCHER *v.* PLESILY LAPP.

CONVEYANCE—UNDUE INFLUENCE—CONSIDERATION—FRAUD.—Inadequacy of consideration may be so gross that it shocks the conscience, and furnishes satisfactory evidence of fraud.

ID.—FRAUDULENT REPRESENTATION.—Obtaining the property of another under a form of purchase, without paying any consideration therefor, and with a design of acquiring it for nothing, is fraudulent in itself. Misrepresentation and deception in such a case will be implied.

COOS COUNTY. Defendant appeals. Affirmed.

The facts are stated in the opinion.

*William R. Willis,* for Respondent.

Where inadequacy of consideration or undue influence is joined to imbecility or weakness of mind arising from old age, sickness, intemperance, or other cause, equity will set aside the transaction at the suit of the injured party. (See Bigelow Fraud, pp. 281–287; *Allore* v. *Jewell,* 94 U. S. 506, 511, 512; *Cowell* v. *Cornell,* 75 N. Y. 91; *Clarke* v. *Sawyer,* 3 Sand. Ch. 351; *Brice* v. *Brice,* 5 Barb. 533; *Moore* v. *Moore,* 56 Cal. 89.)

*J. M. Siglin,* for Appellant.

In order to set aside a deed for undue influence, it must be shown that grantor's mind was weak, that undue influence was exerted, and that it was the undue influence which caused the execution of the deed; that it was not grantor's free act. (*Bigelow* v. *Leabo,* 8 Oreg. 147; *Cudney* v. *Cudney,* 68 N. Y. 148, 151; *Gardiner* v. *Gardiner,* 34 N. Y. 155; *Clapp* v. *Fullerton,* 34 N. Y. 190; *Brick* v. *Brick,* 66 N. Y. 144; *Chil. Aid Society* v. *Loveridge,* 70 N. Y. 387.)

THAYER, J.—This appeal is from a decree rendered in a suit commenced by Samuel and Rachel Archer, the respondents herein, against Plesily Lapp and Stephen Lapp, to set aside a deed executed by one William Archer in his lifetime to the appellant Plesily Lapp. The said William Archer was the

father of the respondent. He was residing in Coos County at the time of his death, which occurred in January, 1880. The deed referred to bears date December 7, 1878, and purports to have been executed and acknowledged on that day, but was not recorded in the clerk's office of said county until the 8th day of March, 1879. The premises included in the deed are 160 acres of land, situated in Coos County, and constituted the home of the said William Archer for a number of years prior, and until the time of his death. It is alleged in the complaint, and the proofs tend to show that at the time of the execution of the deed the grantor was eighty-eight years old; that he had been for some time prior thereto infirm, in consequence of extreme age; had been afflicted with dizziness at times; was childish, and was subject to sick spells, and frequently was cross and irritable. His son, said Samuel Archer, resided for some time with his father, and claims to have taken care of him generally for several years; to have furnished him with money at times, and nursed him in his sickness. The son had a wife and child, and they all lived together upon the premises in question for some time. But the old gentleman having conceived a dislike to the son's wife, the latter subsequently built another house for himself and family, where he remained until the 5th day of July, 1878, when he moved to California, after which Mrs. Lapp from time to time assisted the old man and nursed him during his sick spells. He appeared to have some means, money, and cattle, aside from the land.

The son Samuel Archer testified in his deposition given in the suit, that his father had $400 he had put away; that he had that amount when he left for California; and after he left, that he drew some $300 of his money, out of which he paid some of the son's debts. The testimony of his having the $400 appears to have been hearsay, rather, and besides, it does not agree with other portions of the son's testimony; that he let him have the money to enter his land, and supported him for twelve years. But that the father drew the $300, and that he had cattle which he sold from time to time for money, was satisfactorily proved.

The deed in question was drawn up and signed at Coos City, which is situated a few miles above, on the slough near which said William Archer lived. According to the testimony of Mr. D. L. Watson, an attorney residing at said Coos City, said William Archer came to his place on said 7th day of December, 1878, and requested him to draw the deed; that he did so, and it was then signed by the grantor, and duly witnessed; and Mr. Watson filled out the acknowledgment, and gave the deed to said Archer to go and acknowledge it before Mr. Horswill, a justice of the peace in the neighborhood; and that he took it and left. The grant was to Mrs. Lapp, and purports to have been in consideration of $500 received from her. She was not present when the deed was signed. It appears to have been acknowledged before Mr. Horswill, but he testified positively that he did not on the 7th day of December, or at any time, take the acknowledgment of said William Archer to a deed conveying the said premises to Mrs. Lapp. The signature, however, purporting to be that of Frederick Horswill appears, from the testimony of witnesses, and from a comparison of his handwriting with other documents shown in evidence, to have been his, and he evidently took the acknowledgment, or at some time appended his name thereto without having taken it.

The only evidence of the purchase and sale of the premises is that of Mrs. Lapp, and that is very meager. She testified "that she bought a piece of land from him, William Archer; he went to Coos City in the morning, and came back in the evening with the deed, and I received it that day, and paid him the money for it." She was asked what part did Stephen Lapp, her husband, take in purchasing or procuring the deed for the land, and answered, "he had nothing to do with it; he didn't know anything about it for about three months after; he never saw the deed until he saw me hand it to the assessor"; and also testified that she made an effort to keep a knowledge of the fact that she had the money she paid for the land from her husband. She was interrogated as to where she got the $500 which she claimed to have paid for the land, and attempted to explain the fact; but her testimony upon that point was vague and unsatis-

factory.   The circumstances of her affairs showed pretty con-
clusively that she had no such amount of money at the time,
and tended very strongly to show that she was impecunious.
She and her husband were present during the last sickness of
William Archer, and at the time of his death, and seemed to
have had charge of his affairs.   His death occurred only a little
more than a year after the execution of the deed, and there
was only found among his effects the sum of $8.37; and
there was no evidence in the case to justify the conclusion
that at any time after the pretended payment to him of
the $500 he had any such amount of money, or any more
money than he was shown to have had and received from
other sources.   I think we may safely conclude from all the
evidence in the case that Mrs. Lapp never paid a cent for the
land, and that the pretended payment of $500 therefor is a mere
subterfuge.   The whole transaction was a clandestine affair, and
well calculated to excite suspicion as to its honesty and good
faith.   To my mind, it was a clear attempt to swindle the old
man out of his land and defraud the respondents of their inherit-
ance.   The whole surroundings of the case indicate that Mrs.
Lapp controlled the whole matter.   Her husband, very evi-
dently, had no voice in the community affairs of his family, and
William Archer, in his helpless and dependent condition, was
wholly powerless in her hands.   She had full opportunity to
manage him, and her statements and admissions to other parties,
and the result, show beyond question that she did manage him
completely.   Mrs. Agnes Richards testified to the following
occurrence:—

"Question 2.   Were you acquainted with William Archer
during his lifetime?   Answer. I was; knew him from eleven
to twelve years.   Q. 3.   Were you ever present at Mr. Archer's
house when he was sick?   A.  I was there with my husband;
Mr. Archer sent for us.   Q. 5.   Did Mr. Archer think he was
going to die?   A.  We all thought so; he was very sick. . . . .
A. 6.  . . . . Mrs. Lapp was going from one room to another.
She came in the room I was in, and went to a sack that was
hanging by the side of the wall and took out something wrapped

in a cloth. She came to me and held it out in her hand, and asked me if I did not wish I were in her shoes. She went to the bed-room, to the old man, with what she had. She told me afterwards it was money. And when we were leaving the house the old man began to cry, and he cried so loud that we heard him out in the meadow; and when we were coming home, Mrs. Lapp told me what she had in that cloth was money, but how much I do not know. Q. 9. Did Mrs. Lapp say anything to you about what she intended to take, or would take? A. When he was crying she said: ' What trouble the old thing is; I would take every cent of money from him if I could.' "

And Mrs. Martha J. Hall testified to statements made by Mrs. Lapp, in a conversation she had with her, to the same effect. The following is the substance of her testimony:—

" I had a conversation in December, 1879, with her. She said she had wormed the old man's land out of him, and she intended to have Sam's yet. Question 4. State the rest of the conversation, if there was anything else. Answer. She said the old man came to her house in the summer and demanded seventy-five dollars, and she had taken his cane out of his hand and larruped him down the hill with it. Q. 6. Do you know what place she referred to when said she had wormed the old man's place out of him? A. I suppose she referred to the place the old man had across the slough. Cross-examination — cross-question : To whom did she refer when she said she would have Sam's land yet? Answer. I suppose she meant Sam Archer, as she was speaking of the old man."

Such statements ordinarily should be received with caution, and we would be inclined to attach no great importance to them in this case, were they not so fully corroborated by the general circumstances disclosed by the evidence. It appears also, from the testimony, that subsequently to the date of the deed the old man executed, at different times, two several wills, bequeathing his property to Mrs. Lapp. There were some circumstances in the case which, possibly, tended to alienate William Archer from his son Samuel Archer, such as his fancied dislike to Samuel's wife, and Samuel going to California; but there was

nothing to show why Mrs. Lapp should have been made a legatee in those wills. She had, it is true, attended upon him in his sickness, and extended to him kind assistance; but he remunerated her for it in money he paid her, and clothing which she obtained upon his account; and, besides, it may be inferred from the testimony of Mr. D. L. Watson that Mrs. Lapp had charged William Archer for waiting upon him and taking care of him when he was sick. That fact appears from the proceedings in the little lawsuit they had in May, 1879. She set it up in her answer as a counter-claim. He obtained a small judgment against her, and then advanced her money to pay off the costs. He evidently regarded the transaction through which the deed was obtained as a piece of chicanery. He bought a pistol, and when asked what he intended to do with it, stated that he had bought it to kill the parties who had robbed him out of his property. He was asked what he meant, and replied that he meant Steve Lapp and his wife; said they had robbed him out of his land and his money and everything he had. It appears also that Mrs. Lapp artfully avoided it being known that she had secured any deed to the property. No surrender of the possession of the land was had, or seems to have been expected. The deed was acquired, and three months thereafter was quietly put upon record; and the beneficiary under it then patiently waited the occurrence that would prudently justify the assertion of the title, the old man's death, which she showed no disposition to have postponed longer than possible—at least, the witnesses who were present in his last sickness testify that she objected to sending for a physician, saying "it was no use, and she would have to pay the bills, as everything belonged to her."

It is unnecessary to animadvert upon the proofs in this case. They may have been exaggerated, but if they are half true, the transaction upon the part of Mrs. Lapp was an infamous scheme to plunder a poor old dotard of his property and effects. The suit to set aside the said deed is founded upon the grounds that the deed was obtained by undue influence, and that there was no consideration for its execution. The pleader went further, and

alleged specific representations claimed to have been made by the grantee in the deed, in order to induce the grantor therein to execute it; but no attempt seems to have been made to prove such representations, and that part of the complaint is wholly unsustained. We think, however, that there is sufficient in the complaint to constitute a cause of suit aside from the special matter referred to, and that a case has been made out for setting aside the deed, if the evidence is sufficient to establish such a character and degree of influence as will authorize it in accordance with the rules of equity. What peculiar arts, persuasions, or representations were resorted to in the case, in order to induce William Archer to deed the land in question to Mrs. Lapp, does not appear, and unless the court can infer from the facts that were proved that the execution of the deed was secured by improper means, it is powerless to grant relief; but from the facts and circumstances of the case, and the statements and admissions of the parties claiming under the deed, a court of equity would necessarily conclude that it was procured through fraud. Inadequacy of consideration may be so gross that it shocks the conscience, and furnishes satisfactory and decisive evidence of fraud. (Pom. Eq. Juris. § 927.) Here there was only the pretense of a consideration. One was probably promised, and doubtless expected, but the possession of the deed was obtained without any intention of paying anything for the land.

It mattered not what particular influence was employed to effect the object and purpose; it was illegal and improper; it was used to accomplish the end designed, and the law adjudges the transaction fraudulent—infers from the facts established by the proofs that the nature of the influence which produced the result was of the character mentioned. The fact that one person has obtained the property of another, under a form of purchase, without having paid any consideration therefor, and with a design of acquiring it for nothing, is fraudulent in itself. Misrepresentation and deception in such a case will be implied, as they are necessary concomitants of the act. It is unlike a case to set aside a deed, for undue influence, where there is no positive element of fraud apparent from the intrinsic nature and

subject of the transaction. There the courts will not interfere, although mental weakness and slight inadequacy of consideration are proven, unless it be shown that such an influence was exerted as to prevent them from judging and acting independently in the matter. In this case Mrs. Lapp dealt with a person whose mental capacity was evidently impaired. She obtained the deed to the land under suspicious circumstances. Her statements and admissions, which the proofs show that she made, concerning the affair, rendered it incumbent upon her part to establish that she paid a full and adequate consideration for the property. She failed to confirm that fact; and the transaction must be regarded as fraudulent. The decree, therefore, of the Circuit Court will be affirmed.

LORD, J., concurring.