192 Or. 483 (1951)
235 P.2d 894
IN THE MATTER OF THE ESTATE OF MARY PORTER, DECEASED
PORTER
v.
UNITED STATES NATIONAL BANK OF PORTLAND, EXECUTOR, ET AL.
Supreme Court of Oregon.
Argued May 23, 1951.
Reversed and remanded with directions September 26, 1951.
*485 John R. Latourette, of Portland, argued the cause for appellant. On the brief were Latourette & Latourette, of Portland.
Irving Rand, of Portland, argued the cause for respondents. With him on the brief were Louis P. Sheahan, of St. Paul, Minn., and George W. Mead, of Portland.
Before BRAND, Chief Justice, and HAY, ROSSMAN, LUSK and TOOZE, Justices.
REVERSED AND REMANDED WITH DIRECTIONS.
TOOZE, J.
This is a suit challenging the validity of an instrument purporting to be the last will and testament of Mary Porter, deceased, on the ground of undue influence.
Mary Porter died at Portland, Multnomah county, Oregon, on January 29, 1949, at the age of 85 years. She left surviving her Margaret Porter Butler, a daughter, and Guy R. Porter, a son. On February 7, 1949, an instrument dated May 8, 1948, which purported to have been executed by Mary Porter and witnessed by George W. Mead and Mary Hanna Sullivan, was admitted to probate in the circuit court for Multnomah county, probate department, as and for the last will and testament of said decedent. The United States National Bank of Portland (Oregon) was appointed executor thereof, and letters testamentary were issued said bank in that behalf.
By this instrument it is provided: First, that all just debts be paid; second, a certain diamond solitaire ring is bequeathed to Mrs. Guy Porter, decedent's daughter-in-law; and third, as follows: "All of the residue of my estate, both real and personal, wheresoever *486 the same may be situated I give, devise and bequeath in equal parts, share and share alike, to my son, GUY PORTER, of St. Paul, Minnesota, and to my daughter, MARGARET PORTER BUTLER of St. Paul, Minnesota." By the fourth paragraph of the instrument, the United States National Bank of Portland (Oregon) is designated as executor.
On August 5, 1949, Guy R. Porter, as contestant, filed his petition to contest will and to prove a former will. A motion directed to certain portions of this petition was sustained, and an amended petition was filed on October 20, 1949. Margaret Porter Butler, as a proponent, and the United States National Bank of Portland (Oregon), as executor, filed separate answers to said amended petition, in which they denied the material allegations of the petition and affirmatively pleaded the validity of the instrument theretofore admitted to probate in common form. Contestant replied to the new matter alleged in the answers, denying the same.
In brief, the amended petition alleged that the instrument theretofore admitted to probate had been executed by decedent as the result of undue influence exercised upon her by her daughter, Margaret Porter Butler. The gist of contestant's charges appears in paragraphs VI and VII of the amended petition which, in part, read as follows:
"VI
"On December 3, 1947, Mary Porter, then being of the age of 84 years, executed her will, which said will recited the fact that her daughter had been well provided for out of the family property, and except for a diamond ring which she bequeathed to her son's wife, she bequeathed all of her estate to her son * * *. Said will was by Mary Porter *487 on the 3d day of December, 1947, signed, sealed, published and declared by her to be her last will and testament in the presence of two witnesses, namely, David L. Davies and Charles E. McCulloch, and said witnesses at her request and in her presence and in the presence of each other, signed their names thereto as subscribing witnesses, a copy of which will is attached hereto and marked Exhibit `A.'
"VII
"A few months after the execution of said will, namely in May, 1948, Margaret Porter Butler learning of its contents, came to Portland, Oregon, from St. Paul, Minnesota, and visited with her mother for about one week. Margaret Porter Butler had great power over the mind and will of her mother during her advancing years and could dominate her actions when she undertook to do so. A few days after her arrival her mother became sick and bed-ridden. She was in great pain and weak in body and mind and so remained, except for occasional intervals, until her death some eight months later. While in such condition said Margaret Porter Butler used undue influence upon her mother and thereby caused her to execute said purported will of May 8, 1948 * * *. It was not the will of Mary Porter but in fact the will of her daughter and was contrary to her desires, her sense of justice, her volition and her own will, and was executed solely through the undue influence of Margaret Porter Butler. * * *"
On the trial the proponent made formal proof of the purported will dated May 8, 1948, the two subscribing witnesses thereto testifying to the same, and rested. Contestant then produced evidence to sustain his charges of undue influence and, by the testimony of the subscribing witnesses thereto, made formal proof of the purported will dated December 3, 1947.
*488 Upon the conclusion of the evidence offered by contestant, the proponent and the executor, without offering any evidence to contradict or explain the charge of contestant and without formally resting their case, moved the court for an order and judgment dismissing the amended petition of contestant on the merits and with prejudice and confirming the probate of the will of May 8, 1948. In support of this motion, counsel for proponent made the following statement:
"* * * it is our position that there is not a scintilla of evidence in this case which would afford an adequate basis for a finding of undue influence, as alleged in the amended petition, or otherwise; that there is not a scintilla of evidence * * * that the will here assailed * * * was anything other than her own voluntary act, an act performed by her upon her own initiative, without the intervention, persuasion or influence of any other person: thus, there is no evidence whatsoever that Margaret Porter Butler, or any other person, at the time of the execution of that will, or at any time theretofore, exercised any influence upon Mary Porter, directed toward persuading her, or inducing her, or compelling her to make that will, or to include any provision therein that is included therein."
The trial court sustained the motion and entered an order and decree dismissing the amended petition of contestant on the merits and with prejudice and confirmed its prior action in admitting to probate the instrument dated May 8, 1948, as and for the last will and testament of Mary Porter, deceased. From this order and decree, the contestant appeals.
The action taken by the trial court in this case is almost identical with that taken by the trial court and condemned by this court in the case of Newman v. Stover, 187 Or. 641, 213 P.2d 137. What was stated in *489 the Newman v. Stover case is apropos to the situation now before the court. At page 644, this court said:
"It is apparent that counsel for defendant intended to have the motion function as a demurrer to the evidence, but, nevertheless, the legal effect thereof was to submit the cause on plaintiff's evidence for decision on its merits. The trial court should have required defendant formally to close his case before considering the motion to dismiss."
In the light of the decision in Newman v. Stover, supra, and the authorities therein cited, the record in the instant case is now before us to determine whether the circuit court at the conclusion of contestant's case was warranted in finding that the evidence failed to show that the will in question was executed by reason of undue influence.
In passing upon the issues as it did in this case, the trial court excluded entirely from consideration a great volume of evidence of a circumstantial nature offered by contestant on the trial, but rejected by the court. The evidence was made a matter of record over the ruling of the court. We shall later refer to some of this evidence, much of which was clearly admissible and should have been and must be considered in determining the issues before the court.
1. This court has repeatedly stated that "undue influence is a species of fraud" and, like fraud, "is rarely susceptible of direct proof." Those who undertake to substitute their will for that of a testator do not ordinarily shout their plans or advertise their actions from the housetops. They usually operate surreptitiously. For those reasons, evidence has a wide range where undue influence is charged and, in most cases, is established by proof of circumstances from which the inference of undue influence is drawn. Newman v. *490 Stover, supra; In re Kelly's Estate, 150 Or. 598, 627, 46 P.2d 84; Estate of Allen, 116 Or. 467, 474, 241 P. 996; 2 Page on Wills, 595, § 812; Rood on Wills (2d ed.), 149, § 190.
2, 3. The burden of proof of undue influence is usually upon the party who asserts it. However, there may be circumstances which cast upon the beneficiary the burden of disproving undue influence. Each case must be decided upon its own peculiar facts. There is no rule applicable to all situations. Where a confidential relationship exists between a beneficiary and a testator, it takes but slight evidence to cast upon the beneficiary the burden of explanation and, in some instances, the burden of disproving undue influence. Therefore, in all cases where undue influence is charged, it is pertinent to the inquiry whether a confidential relationship between the testator and the beneficiary did exist prior to and at the time the contested will was executed. In re Scott's Estate, 191 Or. 90, 228 P.2d 417; Allen v. Breding, 181 Or. 332, 181 P.2d 783; 2 Page on Wills, 599, § 813, 607, § 814. In 2 Page on Wills, 607, § 814, the rule is stated:
"If confidential relations are shown to exist between the testator and the beneficiary, slight evidence of additional facts may shift the burden to the beneficiary. * * * It is also said that the burden of proof shifts to the proponent if the contestant has made out a prima facie case of undue influence."
In In re Southman's Estate, 178 Or. 462, 482, 168 P.2d 572, Mr. Justice BRAND, speaking for this court, said:
"The existence of a confidential relationship * * * when taken in connection with other suspicious circumstances may justify a suspicion of undue influence *491 so as to require the beneficiary to go forward with the proof and present evidence sufficient to overcome the adverse inference."
See also In re Knutson's Will, 149 Or. 467, 41 P.2d 793.
In In re Estate of Meier, 190 Or. 140, 224 P.2d 572, 577, Mr. Justice HAY again stated the rule thus:
"In considering whether or not Fred Meier's will was the result of undue influence exercised by Agnes Meier, the principal beneficiary, upon the testator to the extent of overcoming his free agency, the existence of a confidential relationship between beneficiary and testator is important. Such a relationship does not of itself give rise to a presumption of undue influence, but it may be considered along with other suspicious circumstances, and, so considered, may justify an inference of undue influence sufficiently to put upon the beneficiary the burden of proving that no undue influence was exercised in fact. * * * Activity by a principal beneficiary in the preparation of a will is one such suspicious circumstance."
See also 68 C.J., Wills, 759, § 451.
4. Where, in addition to the relationship of parent and child, there exists between a testator and the child a confidential relationship, as where the child attends to all of his parent's business, the rule of presumption with reference to confidential agents applies, not the rule with reference to parent and child. 2 Page on Wills, 626, § 821.
What constitutes undue influence in the law of wills has been repeatedly stated by this court, and it is unnecessary, therefore, for us to again restate the same. In re Kelly's Estate, supra; In re Estate of Riggs, 120 Or. 38, 241 P. 70, 250 P. 753; Estate of Allen, supra; In re Diggins' Estate, 76 Or. 341, 149 P. 73; Holman's Will, 42 Or. 345, 70 P. 908.
*492 5. In Estate of Allen, supra, at page 473, the late Justice BROWN, speaking for the court, quoted favorably the following from 4 Words & Phrases (2 Series), 1059:
"`Undue influence' is that which compels the testator to do that which is against his will, from fear, the desire of peace, or some feeling which he is unable to resist." (Italics ours.)
See also 43 Words & Phrases, 160.
6, 7. The theory which underlies the doctrine of undue influence is that the testator is induced by various means to execute an instrument which, although his, in outward form, is in reality not his will, but the will of another person which is substituted for that of testator. Such an instrument, in legal effect, is not a will at all. Although executed by the testator, his intention to make a will is so defective that the instrument is invalid. 1 Page on Wills, 368, § 184.
With the foregoing principles of law in mind, we will now review the record in this case.
Mary Porter was the widow of Andrew R. Porter, who died in Portland on June 7, 1947. During his lifetime, Andrew R. Porter was a member of the partnership firm known as Porter Brothers. This partnership was composed of three brothers, Andrew R., Richard B., and John D. Porter. The firm owned the controlling interest in several real estate and timber companies, including the Porter building in Portland. Andrew R. Porter owned 1,363 shares of the capital stock of the Porter building company, 500 shares of the capital stock of the United States National Bank of Portland (Oregon), and he and his wife, as tenants by the entirety, owned four lots located in the Irvington district in Portland, upon which was constructed a *493 costly and expensively furnished home. There is testimony that the furnishings were of the value of $75,000, but the record is silent as to the value of the real property.
At some time prior to March, 1937, Porter Brothers commenced to experience serious financial reverses and were involved in tax difficulties with the United States Government. The firm failed to recover from these reverses, and, at the time of the death of Andrew R. Porter, his interest in the remaining assets of the partnership was estimated to be of the value of $40,000. Although the record does not disclose the exact date of the transaction, it does appear that at some time prior to March, 1937, Andrew R. Porter transferred to his wife, Mary Porter, the capital stock which he owned in the Porter building company and the United States National Bank, entirely stripping himself of all assets except his interest in the home property and the partnership.
Upon his death, Andrew R. Porter left a will by which he devised and bequeathed all of his property to his widow, Mary Porter, and designated her as executrix. In this will appears the following clause: "I make no provision in this my last will and testament for my son, GUY R. PORTER, or my daughter, MARGARET PORTER BUTLER, since ample provision has heretofore been made for them." This will was admitted to probate on July 3, 1947, with the law firm of Hart, Spencer, McCulloch & Rockwood acting as attorneys for the estate. The estate consisted of 54 shares of the capital stock of the Porter building company of the appraised value of $675 and the aforesaid interest in the remaining assets of the partnership.
On the trial contestant offered proof that in March, 1937, Mary Porter entered into a written agreement *494 with her daughter, whereby in consideration of certain things to be done and performed and certain monthly payments to be made by the daughter, she, Mary Porter, conveyed to the daughter her interest as a tenant by the entirety in the home property, together with the furnishings therein contained, and also transferred to the daughter the said capital stock of the Porter building company and the United States National Bank. Contestant also offered proof that as a part of this same transaction, Andrew R. Porter conveyed to his daughter his interest in the home property, subject to the tax lien of the Federal Government. Proof also was offered that on April 14, 1937, a trust agreement was entered into with Margaret Porter Butler named as trustor, and with Margaret Porter Butler and Northwestern National Bank and Trust Company of Minneapolis, Minnesota, named as trustees, wherein and whereby said real and personal property was conveyed and transferred to said trustees upon certain trusts in favor of Mary Porter and Andrew R. Porter, and which trust agreement was approved in writing by the said Mary Porter and her husband.
8, 9. The trial court sustained an objection to this proffered evidence and to all other evidence pertaining thereto, and it was made a part of the record over the ruling of the court. The trial court erred in rejecting this evidence. It was highly relevant, material, and important in establishing the confidential relationship that existed between Mary Porter and her daughter, far and beyond that of parent and child. As will later appear, it also was relevant and material to other issues in the case.
Under these agreements Mary Porter and her husband were permitted to occupy the home property until the death of the survivor of them, but were required *495 to pay accruing taxes thereon, insurance premiums, and costs of repair. During her lifetime, Mary Porter was to be paid $416.67 per month, and upon her death, if Andrew R. Porter survived her, he was to be paid such sum each month so long as he should live. Upon the death of both parents, all assets remaining in the trust estate were to become the sole and absolute property of Margaret Porter Butler. These monthly payments were to be made out of the trust estate, it being provided that the capital stock of the United States National Bank should be sold and the proceeds of such sale first used for the purpose.
Under the original agreement the undertaking of Margaret Porter Butler to take over the property and make the monthly payments was absolute. It contained no provision permitting her to terminate her obligations at any time by reconveying and retransferring the property to her parents, or the survivor thereof. Significantly, however, the trust agreement executed in Minneapolis and approved by the parents, in addition to giving Margaret Porter Butler practically entire control of the trust estate, also provided as follows:
"This agreement is made upon the express understanding that if, at any time, the Trustor and Co-Trustee, Margaret Porter Butler, desires to relinquish the trust hereby created and be released therefrom and also from those certain agreements made by and between herself and Mary Porter, and herself and Andrew R. Porter, dated March 12, 1937, she may resign such trust and rescind said agreements * * * and upon reconveyance and delivery of all properties and securities * * * she shall be fully released and discharged from all duties and obligations herein contained and in said above mentioned agreements contained. It is specifically understood and agreed that in case of such resignation *496 said Margaret Porter Butler shall be placed in statu quo, and repaid all moneys due her, and shall suffer no loss whatever by reason of the premises." (Italics ours.)
It is noted that the trust agreement contained no similar provision giving the parents, or either of them, the right to terminate the same.
It also is noted that by the above mentioned transfers of property to Margaret Porter Butler, her parents wholly divested themselves of all their visible assets except the uncertain interest in the partnership and certain jewelry owned by Mary Porter. From the time of such transfers and continuously up to the times of their respective deaths, Mary Porter and Andrew R. Porter were largely dependent upon their daughter. They had no source of income whatever except the $416.67 per month. Subsequent events demonstrated that this sum was decidedly insufficient to maintain these elderly people in the manner to which they theretofore had been accustomed and at the same time pay insurance premiums, accruing taxes, costs of repairs, necessary nurse hire, and other such expenses. For the money necessary to cover these additional expenditures, they had no one to whom they could look, other than the daughter. In effect, she controlled the purse strings.
It having been conclusively established that a confidential relationship existed between the beneficiary and testatrix, it remains to be determined whether the record discloses "other suspicious circumstances" which "may justify a suspicion of undue influence so as to require the beneficiary to go forward with the proof and present evidence sufficient to overcome the adverse inference." In re Southman's Estate, supra.
*497 Much of the testimony offered by contestant respecting such "other suspicious circumstances" was rejected by the trial court and presented over the ruling. We shall not single out each bit of evidence so rejected and pass upon its admissibility, but will discuss that which was rejected and which we deem material, along with the other evidence that was admitted in the case, in determining the question now before us.
We think it exceedingly material to discuss the relationship existing between one David L. Skidmore and the testatrix. Skidmore became associated with Porter Brothers in 1931 and served as manager of the business affairs centered in Portland, including the operation of the Porter building. He continued in that capacity until after the death of both Andrew R. and Mary Porter. Over the years of his employment there existed between Skidmore and Andrew R. and Mary Porter a very close personal relationship in addition to the business relationship. Skidmore and his wife frequently visited in the Porter home. Until September, 1940, the relationship between Skidmore and Mary Porter was largely social and personal. Until then Andrew R. Porter took an active part in the management of the affairs of Porter Brothers, and Skidmore's business dealings were chiefly with him.
But in September, 1940, Andrew suffered an illness from which he never recovered and thereafter was wholly unable to attend to business matters. As a result, Skidmore was faced with the necessity of more or less carrying on alone so far as the business in Portland was concerned, but conferred with Mary from time to time respecting the same.
Beginning with the illness of Andrew and continuing until her death, Mary Porter constantly relied *498 upon Skidmore for advice and assistance. Whenever she was confronted with a problem of a personal or business nature, Skidmore was called upon to solve it. She frequently telephoned him for advice and help and many times called at his office, or had him call upon her at her home. He was not only an employe, but also a personal friend and confidant.
In 1943, Mary Porter desired to execute a will. She communicated with Skidmore, requesting him to make arrangements for her to see a lawyer. Skidmore took her to W.M. Huntington, since deceased, whose firm had long represented Porter Brothers. Huntington prepared a will which was duly executed by Mary Porter on November 23, 1943. The significant portions of said will are:
"II.
"Since September 1, 1940, my daughter, MARGARET PORTER BUTLER, has been advancing to me and my husband, ANDREW R. PORTER, various amounts in excess of remittances of $416.67 monthly, which latter remittances she makes under an arrangement made between us for valuable considerations several years ago. Each and all of these advances in excess of said $416.67 monthly amounts have been paid by my said daughter and received by me and my said husband with the understanding and agreement that these advances constitute loans and will be repaid by my husband and myself and each of us. I hereby direct that any balance unpaid on account of said advances at the time of my death, with interest at the rate of six per cent per annum on the several amounts from the respective dates on which they were paid to us, be determined and that said aggregate amount be paid, transferred and granted out of my estate to my said daughter to cover said advances. I direct that these advances be paid as above directed whether or not collection *499 of any part thereof is barred by the statute of limitations and whether or not my said daughter has ever asserted or made a claim against me or my said husband or his estate therefor.
"* * *
"VI.
"All the rest, residue and remainder of my estate of whatsoever kind and wheresoever found, whether real, personal or mixed, I give, grant, devise and bequeath to my said daughter, MARGARET PORTER BUTLER and my son, GUY R. PORTER, share and share alike.
"VII.
"I hereby nominate and appoint my friend, DAVID L. SKIDMORE, as the executor of this, my last will and testament and direct that he shall not be required to furnish any bond * * *."
At the time this will was executed, Mary Porter had no property whatever except some jewelry and her interest under the trust agreement, which latter interest, of course, terminated upon her death. As of that time there was but one foreseeable possibility by which she might acquire properties which, upon her death, would become a part of her estate and thus enable her executor to follow the directions contained in paragraph II of her will. That was for Margaret Porter Butler, during the lifetime of Mary Porter, to exercise her right of rescission reserved to her under the provisions of the trust agreement above quoted. It is reasonable to assume, therefore, that this portion of Mary Porter's will was directed to that possibility, so that in the event of such rescission, the provisions of the trust agreement respecting reimbursement for advances made would be carried out, had such reimbursement not been made prior to Mrs. Porter's death.
*500 In February, 1947, Mary Porter phoned Skidmore, advising him she wished to execute a new will. Attorney Huntington had died in the interim, and Skidmore took her to see Roland Davis, a member of the Huntington firm. He drew the will. As her reason for executing this will, Mary Porter, according to the testimony of Skidmore, explained:
"In her former will [1943] she had provided that Mrs. Butler be repaid all advances she would make to herself  to Mrs. Porter  before the remainder of her estate was divided, between Mrs. Butler and Guy Porter. She said that the former will had contained that provision, but now that the building had been sold, she felt that there was ample money in the trust to repay Mrs. Butler for those advances, to come out of the estate, and she wanted that change made."
In this will Mary Porter omitted the provisions respecting advances and again designated her friend Skidmore as executor.
We now advert to another line of testimony. When Andrew R. Porter became ill in September, 1940, one Mary Hana Sullivan was employed as a nurse to care for him at the agreed compensation of $5 per day. Mrs. Sullivan continued in that capacity until the death of Andrew R. Porter in June, 1947. Thereafter, she continued to act as nurse, companion, and confidante to Mary Porter until the latter's death and at the same rate of pay. During all this period of time Mrs. Sullivan spent the days in the Porter home, but spent the nights in her own home, though subject to call at all hours. It appears from the record that payment for these services was made by Margaret Porter Butler, being advances over and above the $416.67 per month payments made under the trust arrangement, *501 which advances were to be repaid to Mrs. Butler with interest. It follows, therefore, that though ostensibly an employe of Andrew R. and Mary Porter, Mrs. Sullivan was in fact dependent upon Mrs. Butler for her compensation, and was, in effect, at least, her employe.
We now note the fact that in late 1946 the Porter building was sold to the United States National Bank of Portland (Oregon). In January, 1947, as the result of this sale, there was paid into the trust fund hereinabove mentioned the sum of $100,000 in cash, with a balance due such fund of approximately $20,000. Out of this cash Margaret Porter Butler was entitled to reimburse herself for all advances she had made for and on account of her parents, leaving a balance of cash in such fund of approximately $60,000. It was this reimbursement that Mary Porter had in mind when she executed her will in February, 1947, above referred to. In passing, we take cognizance of the fact that, in the sale of the Porter building, Mrs. Butler was represented by George W. Mead, an attorney of Portland.
Mead, though living neighbor to the Porters for about 40 years and friendly with them, had never been employed as an attorney to represent them, or any of them, in connection with any matter whatever, other than his representation of Margaret Porter Butler. Mary Porter had expressed herself against the employment of Mead as an attorney, because, as she said in effect, she didn't want the neighbors to know too much about her business.
Digressing, we note that, at the beginning of the trust arrangement in 1937 and for a few years thereafter, Andrew R. and Mary Porter were able to keep up the payments on taxes accruing against the home *502 property; yet upon the advent of the illness of Andrew and the additional expenses incident thereto, it became impossible for Mary Porter to continue the payment thereof. As a consequence, by 1944 a considerable amount of money was due and unpaid for taxes. Mary Porter had inquired of Skidmore about these taxes. He discovered the delinquency and immediately communicated with Mrs. Butler. Skidmore testified:
"Well, let's see: shortly after,  I would say probably a week after [after he had written Mrs. Butler], Mrs. Porter phoned me at home one Sunday evening and said that Mrs. Butler had phoned her, and that Mrs. Butler was quite disturbed because her mother had not taken care of her taxes, but she said she would take care of them  Mrs. Butler told her she would take care of them, and she wished Mrs. Butler  Mrs. Butler wished her mother to send her the jewelry 
"* * *
"Mrs. Porter asked me then  she said that her daughter had asked her to send her her jewelry, and Mrs. Porter asked me if I would meet her the next day down town so that she could get her jewelry from her safe deposit box and take it to Heitkempers for appraisal for shipment to Mrs. Butler. The next day Mrs. Porter came down, and I accompanied her to the bank when she got her jewelry, and I accompanied her up to Heitkempers, where she gave it to Mr. Allard Heitkemper and asked him to appraise it and to ship it to her daughter.
"Q. (By Mr. Latourette) What was the connection between the jewelry and the taxes, if any?
"A. The connection was that Mrs. Porter said that her daughter requested that the jewelry be sent before the taxes were paid."
Mrs. Butler paid these delinquent taxes, and the money required therefor was a part of the advances *503 for which she could reimburse herself out of the funds received on the sale of the Porter building. This jewelry was all that remained in the way of assets in the hands of Mary Porter and left her thereafter all the more dependent upon her daughter.
We have heretofore noted the probate of the last will and testament of Andrew R. Porter, deceased, and the appointment of Mary Porter as executrix of the estate. C.E. McCulloch performed the legal services necessary in connection with the administration of this estate and by reason thereof became well acquainted and closely associated with Mary Porter. David Skidmore was one of the appraisers of that estate and in its administration continuously advised and assisted the executrix.
While this estate was in the course of probate and on or about November 8, 1947, Margaret Porter Butler caused to be presented her claim against said estate in the sum of $15,785. The claim was itemized as follows:

 "Cash advanced and paid in the sum of
 $35.00 each week, by said Claimant, Margaret
 P. Butler, at request and for benefit of said
 Decedent, Andrew R. Porter, during period of
 39 consecutive weeks commencing September 6,
 1940, and ending June 6, 1941, both dates
 inclusive and applied in payment of necessary
 nursing service rendered said Decedent and
 his Spouse. $ 1,365.00
 "Cash advanced and paid in the sum of
 $35.00 each week by said Claimant, Margaret
 P. Butler, at request and for benefit of said
 Decedent, Andrew R. Porter, during the period
 of 312 consecutive weeks commencing June 7,
*504 1941, and ending June 6, 1947, both dates
 inclusive, and applied in payment of
 necessary nursing service rendered to said
 Decedent and his Spouse. $10,920.00
 "Cash advanced and paid in the sum of
 $3,500.00 at request and for benefit of said
 Decedent, Andrew R. Porter, by said Claimant,
 Margaret Porter Butler and applied in payment
 of hospitalization and medical care and
 treatment necessarily afforded to said
 Decedent in the year 1940 and 1941, and
 applied in payment of necessary nursing
 service rendered to said decedent and his
 Spouse. 3,500.00
 "Total Amount _____________ $15,785.00"

There are some things concerning the presentation of this claim that are worthy of mention. At the time the claim was prepared, so far as the record discloses, Margaret Porter Butler had repaid herself for all these advances out of the $100,000 received on the sale of the Porter building, and the estate owed her nothing. If not, there still remained ample funds from which she might reimburse herself without seriously depleting the trust fund. Moreover, it will be recalled that in executing her will in February, 1947, Mary Porter labored under the impression that her daughter had been, or would be, repaid in full for all advances made, for, as we have before observed, she omitted from this will a provision respecting the repayment of advances such as was contained in her will of November, 1943. Further, whatever the value of the assets in this estate, it was all that remained to Mary Porter from the lifetime accumulations of her husband and herself, other than her interest in the trust. It was the only property of her parents, the possession and *505 ultimate ownership of which Mrs. Butler had not already acquired. With these assets at her disposal, it is reasonable to assume that, during the remainder of her life, Mary Porter would not be dependent upon her daughter for any funds necessary over and above the fixed monthly payments.
This claim was prepared in Minneapolis by an attorney of that city who had for several years represented the extensive Butler interests, viz., Louis P. Sheahan, one of the attorneys appearing for proponent on the trial of the instant case. Because he was unacquainted with the practice prevailing in this state respecting the presentation of claims against an estate, Mr. Sheahan caused this claim to be sent to the sheriff of Multnomah county for service upon Mrs. Porter. The claim was served upon this elderly lady late in the evening by a deputy sheriff. She could not understand it and was considerably shocked. She immediately telephoned Skidmore to tell him about it and ask his advice.
We do not assume to speculate as to the real reasons which prompted Mrs. Butler to take such steps, but we do feel that the circumstances surrounding the presentation and ultimate allowance of this claim demand an explanation on her part, even beyond that offered by her attorney, Mr. Sheahan, and hereafter referred to. The presentation of this claim played an important part in the execution by Mary Porter of her will of December 3, 1947.
We shall again refer to this claim. Before doing so, however, we shall discuss some of the other evidence in the case, and, in particular, the circumstances surrounding the execution of the will of December 3, 1947.
*506 Margaret Porter Butler was the wife of Robert Butler, a prominent and wealthy businessman of St. Paul, Minnesota. At one time Robert Butler was in the diplomatic corps of the United States, representing this government in Australia, and, at the time of the probate of the estate of Mary Porter, he was ambassador to Cuba. Upon the death of both parents, Margaret Porter Butler would own substantial wealth in her own right as the result of the trust arrangement referred to previously. On the other hand, Guy R. Porter had no accumulated wealth, having been an employe of others and, for several years immediately prior to the death of Mary Porter, being in the employ of the Butler interests.
Under all the circumstances mentioned, on November 23, 1947, Mary Porter telephoned to Skidmore and asked him to make an appointment with C.E. McCulloch for the purpose of discussing a new will. The appointment was made for November 26, at which time Skidmore drove to the Porter home, picked up Mrs. Porter and Mrs. Sullivan, and took them to McCulloch's office. In McCulloch's office, according to the testimony of both Skidmore and McCulloch, Mrs. Porter discussed the affairs of her husband's estate, also the claim presented against the estate by her daughter, asking for advice as to what should be done about it. She further advised McCulloch of the tax situation as regarded the home property and told him how she had sent her jewelry back to Mrs. Butler when Mrs. Butler advanced the money to pay the taxes; she also told McCulloch what she would like to do. Skidmore testified  and this testimony was corroborated by McCulloch  as follows:
"She said she thought, in fairness to her son, Guy, that whatever there might be left from the *507 timber should go to him, to equalize for the large sum that would be Mrs. Butler's remainder interest in the trust, which, of course, had been established from assets of Mrs. Porter.
"* * *
"She said that she wished Mr. Guy Porter's wife to get a ring."
McCulloch prepared the will, and on December 3, 1947, Skidmore took Mary Porter, accompanied by Mrs. Sullivan, to McCulloch's office where the will was executed. Accompanied by Mrs. Sullivan, Mrs. Porter placed this will in her safety deposit box in the bank.
The significant portions of this will are the following:
"ARTICLE III
"I am not making provision herein for my daughter, MARGARET PORTER BUTLER, for the reason that she has been otherwise provided for out of properties originating with my deceased husband, ANDREW R. PORTER, and with me.
"ARTICLE IV
"All the rest, residue and remainder of my estate of whatsoever kind and wheresoever found, whether real, personal or mixed, I give, grant, devise and bequeath to my son, GUY R. PORTER.
"ARTICLE V
"I hereby nominate and appoint my friend DAVID L. SKIDMORE as executor of this my last will and testament and direct that he shall not be required to furnish any bond or undertaking for the proper discharge of his duties as such executor. * * *"
*508 We quote now from the testimony of C.E. McCulloch with respect to the claim presented by Mrs. Butler:
"She [Mary Porter] came into my office the latter part of November, and in early December, 1947, on two occasions, and on both occasions Mrs. Sullivan was with her, and on both occasions Mr. Skidmore was with her * * *. The chief discussion at the first of those meetings was a question of making a new will, and the discussion about this claim * * *. Mrs. Porter said she had been very much upset and very much disturbed to receive the claim. I asked her as to the merits of it, whether there had been any agreement that these amounts in excess of the $416 and some cents were understood to be, by agreement, loans, and she said there had been no understanding or agreement at all, but that she and Andrew, her husband, had considered them just gifts or contributions made by their daughter Margaret for the benefit of the family, and that she had been shocked to receive the claim. She asked me whether it should be approved, or whether it should not be approved. Some question came up as to whether some substantial portions of it were barred by the statute of limitations; in any event, as a matter of mechanics, I undertook to get some further information, which I think I did through Mr. Mead. * * *
"Q. * * * how did you happen to contact Mr. Mead?
"A. Oh, he called me at one time, as I recollect, and asked me what progress had been made  whether Mrs. Porter, as executrix, were approving the claim or not, and at that time we had not arrived at any determination as to whether the claim would be approved or not. * * * I was interested in whether Mrs. Porter, as a matter of her wishes, and as a matter of principle, would want to approve the claim in whatever amount was proper * * * and in our discussion at my office the fact was brought out by Mrs. Porter that her daughter Margaret *509 had had a very fine income on these properties that had been turned over when Margaret had agreed to pay her father and mother this $416 per month that they were living on. At the time that was made, it was very uncertain, of course, what the values of the properties might be * * * but at this time the amounts that had been repaid were very substantially larger than the amounts that Margaret Butler had advanced on the monthly payments, and the question was: should we approve this claim, and then later it had a bearing on the kind of will that she should make.
"* * *
"There was no conclusion, as I recollect it, at that meeting about the claim; I was to get a little further information with respect to it from Mr. Skidmore; we were to look it up a little more, and everyone wanted to think about it a little further.
"* * *
"* * * the second time she was at my office was on December third, of 1947. We made no final determination with respect to the claim at that time. Mrs. Porter never got mad at anybody, but she was grieved and distressed about the way this claim had been presented, and the fact that there had been a claim presented, and was searching for what she ought to do with respect to it. I think the matter of the decision to approve the claim was made at a considerably later date." (Italics ours.)
During the month of December, 1947, Mrs. Butler arrived in Portland for a visit with her mother. Subsequent to this visit and on December 19, 1947, Mrs. Porter telephoned Skidmore, saying she had had a very enjoyable visit with her daughter, that her daughter had explained to her the reasons for the claim being filed, and that Mrs. Porter wished to have it approved. Skidmore asked her if she had told Mrs. *510 Butler about that will Mr. McCulloch had written, and she told him that she had not, because she felt that it would precipitate an unpleasant situation. Mrs. Porter also told McCulloch that she was approving the claim in the interests of harmony. The claim was formally allowed in early February, 1948. It is significant that upon her visit with her mother in December, Margaret was able to secure approval by her mother of the disputed claim. The approval was given to maintain peace and harmony. This is but another straw in the wind.
Though in order to prevent trouble Mrs. Porter did not herself tell Mrs. Butler about the will of December 3, nevertheless, in the light of the entire record, and unexplained, it may well be inferred that Mrs. Butler actually did receive the information from some source. Under all the circumstances of the case, and with no other explanation, it might well be inferred that she received it from Mary Hana Sullivan, because it is unlikely that either McCulloch, Davies (a witness to the will), or Skidmore told her. And they, with Mrs. Sullivan, were the only persons having knowledge thereof, other than testatrix.
Respecting the jewelry delivered to Mrs. Butler in 1944, Mr. McCulloch related a conversation he had with Mrs. Porter. He testified:
"The conversation with respect to the jewelry was something like this: that there had been a time, sometime before, when there were some taxes to be paid on the home property, and Mrs. Porter was asked to send the jewelry back as additional security for those taxes that were to be paid, and that the jewelry had been sent back to Mrs. Margaret Butler as security, additional security, when moneys were advanced to take up the taxes on the *511 home property out here, and that Mrs. Porter said `Well, then, if this claim is paid or allowed out of Andrew's estate, why then I can get my jewelry back,' and possibly that was discussed, and possibly that was one of the reasons why eventually the claim was approved. The chief reason, though, was because Mrs. Porter did not want to have a controversy in the family."
Early in May, 1948, Mrs. Butler arrived in Portland to visit her mother. The day after her arrival Mrs. Porter suffered an arthritic attack in her back, requiring her to remain in bed where thereafter she spent most of her time and suffered considerable pain. On May 5, Mrs. Butler left Portland for her home in St. Paul. As to what occurred immediately afterward, Mrs. Sullivan testified:
"It was on the evening of the 6th she [Mrs. Porter] had made the statement that she would like to see Mr. Mead on business; and I had called the office and I couldn't get him; I usually had gone home around 3:30 or four o'clock, and I told her I would return, and I placed a call from the Porter residence to the Mead residence, which was around eight o'clock, and then is when I got in touch with Mr. Mead. * * * he came there the morning of the 7th.
"Q. Did she tell you what she wanted to see him about?
"A. She said it was on business; she wanted to make a new will.
"* * *
"She said she had done something in December that she was very sorry for.
"Q. When did she tell you that?
"A. That was the afternoon of the day that I called Mr. Mead; she wanted to rectify it.
"* * *

*512 "Q. Did she tell you what she was sorry about? Why she was sorry?
"A. She said `We do things that we are sorry for later.'
"Q. Did she tell you in detail what she was sorry about?
"A. She felt that she had acted in haste, and it was a result of the claim that had been put against the timber estate."
Mr. Mead prepared the will, and on May 8, 1948, it was executed. The United States National Bank of Portland (Oregon) was designated as executor, not Mary Porter's friend, David Skidmore. Skidmore was never told about the execution of this will, although, as heretofore noted, at all times prior to its execution, Mary Porter had turned to Skidmore for advice and help in all minor, as well as important, matters. After the execution of this will Skidmore and his wife continued to visit Mrs. Porter in her home, and he discussed business and other matters with her.
According to Mrs. Sullivan, she accompanied Mrs. Porter to the bank sometime later where this will was placed in the safety deposit box, and the will of December 3, 1947, was removed and later burned in the home by Mrs. Porter.
After the claim of Margaret Porter Butler against the Andrew R. Porter estate had been allowed, there remained in that estate approximately $22,000, and this was the only money that would be divided equally between the two children upon the death of Mrs. Porter. Between December 3 and May 8 there had been no change in circumstances at all except the allowance of Mrs. Butler's claim. With the allowance of this claim it would seem that there was all the more reason why the provisions of the will of December 3 should stand, *513 if Mary Porter truly expressed her real feelings in December.
Though in full possession of her mental faculties, nevertheless, at the time the will of May 8 was executed, as well as during the days while the daughter was in Portland, Mary Porter, then 84 years of age, was suffering physical pain and was weak in body. It might be reasonable to infer that to secure "peace and harmony," Mary Porter could easily be persuaded by her daughter, as she had been persuaded respecting the claim against her deceased husband's estate.
The record also supports the conclusion that Margaret Butler knew all about the will of May 8. Immediately following the death of Mary Porter the matter of the will was being discussed between Mr. and Mrs. Butler and Guy R. Porter. They informed Guy that his interest under the will would be approximately $11,000. They advised that the will was in the possession of Mr. Mead, and a day or so later Mr. Mead produced the will. How this will got out of the safety deposit box and into Mead's hands is not explained, provided, of course, we accept as true the testimony of Mrs. Sullivan that it was placed in the safety deposit box by Mrs. Porter.
However, in the light of the record as it is now before us, we cannot accept as true this testimony of Mrs. Sullivan, though in rejecting it we do not wish to be understood as indicating that in our opinion the witness was intentionally false; she may have been honestly mistaken. The present record justifies the conclusion that this will remained in Mr. Mead's possession from the time of its execution until produced after Mary Porter's death. Obviously, if Mr. Mead retained possession of the will, it was because Mary *514 Porter requested it. For an attorney to retain custody of a will is not at all unusual; in fact, it is quite customary. That Mr. Mead was asked to retain custody here is important only because he was Mrs. Butler's attorney, and also because Mrs. Porter did not follow her usual practice of using the safety deposit box. In this connection, however, we do not wish to be understood as indicating that there was anything inherently wrong in any of this. It is just one of the circumstances of the case. We note that as a witness Mr. Mead was not afforded any opportunity to discuss any of these matters.
But proponent evidently thought it important to explain away the apparent inconsistency of Mrs. Sullivan's testimony, because in her brief filed in this court she seeks to explain the situation as follows, and we quote:
"The will of the deceased was signed by her in duplicate and signed by the witnesses in duplicate; one original was left by the deceased in her deposit box as stated by this witness [Mary Hana Sullivan], and one was delivered to the bank by George Mead, and produced by the bank upon the death of Mary Porter." (Italics ours.)
In so far as the record is concerned, the foregoing is a gratuitous statement of facts, not supported by any testimony whatever. Neither Mead nor Mrs. Sullivan, the subscribing witnesses to the will, testified to any such procedure. Moreover, to execute a will in duplicate, though it has been done, is indeed unusual, to say the least. Furthermore, neither at the time of probate nor at any other time was any duplicate presented to the court or in any way accounted for. 68 C.J., Wills, 886, § 615.
*515 There is testimony in the record indicating a determined effort on the part of Mrs. Butler to undermine and destroy the trust and confidence so long reposed by her father and mother in David L. Skidmore. In explaining the reason why Mrs. Butler filed her claim against her father's estate, her attorney, Mr. Sheahan, stated in substance that it was for the purpose of giving her such standing with respect to the estate that she could force an investigation into the business affairs of decedent and, in particular, an investigation of Skidmore's management thereof. Such an investigation as was made at her instigation did not disclose any irregularities, but it may have accomplished her real purpose. From this, and with no explanation, the inference might be drawn that the same was but a part of a preconceived pattern designed solely for the purpose of dominating and controlling the will of Mary Porter.
Of course, the evidence discloses that Mrs. Butler was not present when the will was executed, and there is no direct proof that she in any way actively participated in person in its preparation. But Mary Hana Sullivan did participate therein, and under the evidence in the case it might be inferred that in so doing she acted on behalf of Mrs. Butler. If so, then she was Mrs. Butler's agent for the purpose, and her acts would be the acts of Mrs. Butler to the same extent as though Mrs. Butler had acted in person. In this regard the record further discloses that shortly after the death of Mary Porter, Guy R. Porter and his wife, who were then occupying the Porter home, were, upon order of Mrs. Butler, compelled to vacate the premises, and immediately thereafter Mary Hana Sullivan and her husband moved in. Also, about this time Mary Hana Sullivan and her husband were furnished *516 a trip to Cuba with all expenses paid by the Butlers, and as their guests.
It might well be that these favors bestowed upon the Sullivans were simply manifestations of gratitude on the part of the daughter for the many years of valuable service rendered to her parents by Mrs. Sullivan, some of which services were no doubt of such a personal and intimate nature that they could not be adequately compensated in money. Or, on the other hand, these favors may have been bestowed as a reward for some assistance which Mrs. Sullivan may have given Mrs. Butler in connection with the subject matter of this litigation, or for her silence. It is obvious that Mrs. Sullivan, who was more or less constantly in attendance upon Mary Porter each day as nurse, companion, and confidante, was in a position to observe and hear many things that transpired between mother and daughter during the visit of the daughter in December, 1947, immediately prior to the mother's change of mind respecting the allowance of the disputed claim against the father's estate, as well as during the daughter's visit in May, 1948, immediately prior to the execution of the disputed will. Mrs. Sullivan was not called upon to testify to any of this. We venture no opinion as to what the true situation may have been, but we do say that this evidence raised questions which Mrs. Butler, the fiduciary, should have answered, but did not.
As before indicated, Guy R. Porter knew nothing of the execution of the disputed will until informed thereof by Mr. and Mrs. Butler. At that time, in the presence of Mrs. Butler and speaking for her, Mr. Butler said to Guy: "Now, you play along with us, and you'll get ten or eleven thousand dollars out of *517 this matter, and it will keep you for awhile." It will be recalled that at that time Mrs. Butler perhaps knew about the execution of the will of December 3, and Mrs. Sullivan had actual knowledge thereof; yet they withheld that information from the son. In fact, in so far as the record discloses, no one in any way connected with the Butlers ever gave Guy any information respecting the prior will. The only persons then having actual personal knowledge of the execution of the same were David L. Skidmore, C.E. McCulloch, David L. Davies (one of the subscribing witnesses to said will and a member of the same law firm as Mr. McCulloch), and Mary Hana Sullivan. Why this secrecy?
From certain evidence in the record it may well be inferred that information as to the prior will was deliberately withheld from Guy with the expectation that he would never learn thereof. It will be recalled that at that time Guy was in the employ of the Butler interests. During the conversations in the Porter home referred to, Guy was instructed, as an employe, to make an investigation into the affairs of Porter Brothers and, in particular, into Skidmore's connection therewith. At that time, as a part of his instructions, Guy was advised to stay away from C.E. McCulloch, whose handling of the affairs of Porter Brothers was severely criticized, and it was suggested that he contact Mr. Mead for any legal assistance he required. We pause to state that the record conclusively discloses that both Skidmore and McCulloch at all times and for many years gave honest, conscientious, faithful, and efficient service to that firm.
Acting pursuant to the instructions he received from his employer and also his sister, Guy immediately embarked upon such investigation. He soon discovered that everything had been handled regularly and efficiently; *518 therefore, he was unable to furnish the Butlers such a report as apparently they had hoped to receive. It was then that Guy, without any assigned reason, was summarily discharged from his employment with the Butlers and notified to quit the Porter home in which he and his wife had been residing continuously from the time they arrived in Portland immediately preceding the mother's death. Though the record does not affirmatively disclose the fact, nevertheless, it may be inferred that it was while he was conducting the aforesaid investigation, Guy learned of the execution of the will of December 3.
The employment of Mrs. Butler's attorney to draw the will, instead of the attorney who had long represented the Porters, and who was then representing Mary Porter as executrix of her deceased husband's estate; the appointment of the bank as executor, instead of David L. Skidmore, her friend, who had been named as such in her prior wills; the secrecy maintained about the will's execution; the fact that the execution of the new will followed so closely upon the heels of Mrs. Butler's more or less hurried visit with her mother, as did the approval of the disputed claim against her father's estate follow so closely her visit in December before; the fact that this will was retained under the control of Mr. Mead, instead of being deposited in the safety deposit box as all prior wills had been; the attempt to keep Guy away from C.E. McCulloch and to destroy his confidence in both McCulloch and Skidmore; the withholding of the information from Guy respecting the will of December 3, together with the other evidence to which attention has been directed, were such suspicious circumstances in connection with the confidential relationship existing as to put upon Mrs. Butler, the beneficiary, the burden *519 of proving that no undue influence was exercised in fact.
No question was raised relative to the validity of the will executed by Mary Porter on December 3, 1947, formal proof of which was made on the trial of this suit. She had testamentary capacity to execute such will, and the record is devoid of any evidence whatever indicating in the slightest degree that that will was not a true expression of her actual desires. If the disputed will is not to stand, then the will of December 3 was and is, in truth and in fact, the last will and testament of Mary Porter.
As noted at the outset, proponent did not formally rest her case before moving to dismiss the amended petition; nevertheless, the motion was of such nature as would authorize us to treat it as having had that effect. The motion was to dismiss "on the merits" and "with prejudice." This had the legal effect of submitting the matter for decision on the merits, and it was so decided by the trial court.
We are firmly of the opinion that litigants should not be permitted to try their cases piecemeal, and that cases such as this should be finally disposed of here and not be remanded to the trial court for further proceedings. There must be an end to litigation. However, we recognize the fact that heretofore there has been some confusion in the practice respecting the use and effect of motions to dismiss in equity proceedings. Newman v. Stover, supra. With respect to the instant litigation, we also recognize that there exist some very exceptional and extraordinary circumstances. Practically all the material evidence giving rise to the suspicious circumstances demanding an explanation was rejected by the trial court and not considered by it in *520 arriving at its conclusions. As before indicated, this evidence is here only because it was taken over the ruling of the court. When it was so taken, it followed that cross-examination of the witnesses was not so extensive as it might well have been, had the evidence been admitted. With that evidence out of the case, there was but little, if anything, that demanded an explanation from proponent. It might reasonably be assumed that because the trial court shut out so much of this evidence, the proponent was lulled into a false sense of security. Of course, her failure to explain anything may have been occasioned by her reluctance to subject herself to searching cross-examination, or she may have had no explanation. We do not know. But under all the circumstances of the case, we do feel that in the interests of justice, proponent should be afforded an opportunity to tell her story in detail, if she so desires.
10. The decree of the circuit court is reversed and the cause remanded with directions to permit both parties to offer additional evidence, if they care to do so. If no further evidence is introduced, the court should enter a decree setting aside and holding for naught the will upon which this contest is based and an order admitting to probate the instrument executed December 3, 1947, as and for the last will and testament of Mary Porter, deceased. If additional evidence is introduced, the court should consider the record in its entirety and enter a decree warranted thereby. Contestant is entitled to costs and disbursements.
LUSK, J. (specially concurring).
Mrs. Butler stood in a confidential relationship to her mother and was in fact, though not in form, her trustee. The evidence as to the existence of this relationship, *521 as to the testatrix' previous wills, her relations with Mr. McCulloch and Mr. Skidmore, and the selection of Mrs. Butler's attorney to draft the contested will so soon after Mrs. Butler's visit with her mother, as well as the evidence of the contestant's straightened circumstances as contrasted with the generous portion of her parents' property already received by Mrs. Butler through the trust estate  all this without more, in my opinion, is sufficient to shift the burden of proof to the proponent.
The court, however, has gone farther than I would go in many of the deductions it draws from the evidence.
I am unable to agree with the court's suggested inference that Mrs. Butler's conduct in filing the claim against her father's estate a year and a half before the contested will was executed indicates, or may indicate, an intention to dominate and control the will of her mother. The evidence is that it had the opposite effect; it was the reason why Mrs. Porter executed the will of December 3, 1947, disinheriting Mrs. Butler.
The suggestions that Mrs. Sullivan informed Mrs. Butler of the contents of the will of December 3, 1947, and that Mrs. Sullivan acted for Mrs. Butler in witnessing the contested will, go beyond what I consider to be the limits of legitimate inference. Mrs. Sullivan was a straightforward and candid witness. She testified at length on both direct examination and cross-examination. It was open to counsel for the contestant to cross-examine her about these matters, but they refrained. So far as this record shows, no such contentions were advanced on the hearing below, and, since Mrs. Sullivan was given no opportunity to meet a charge seriously reflecting on her duty of loyalty to *522 her employer, Mrs. Porter, we should not give it any sanction here, even by indirection.
Neither do I attach the importance which the court apparently thinks should be attached to the evidence that Mr. Mead had the contested will in his possession shortly after Mrs. Porter's death. Mr. Mead is not accused of wrongdoing by the court. The brief of counsel for the contestant states, "We make no criticism of Mr. Mead * * *. He did not know and had no occasion to know what had gone on back of the scene prior" to the execution of the will. If then, as the court concedes, it is not an uncommon thing for a testator to make the attorney the custodian of the will which he draws, what bearing does this fact, if it be such, have on the issue of undue influence? Of course, there is an apparent discrepancy on this point between Mrs. Sullivan's and Mr. Mead's testimony  a discrepancy which neither one of them was given the opportunity to clear up. But I am unable to see what possible motive Mrs. Sullivan could have had for testifying that Mrs. Porter placed the will in the safe deposit box if that was not the fact. Her testimony in this regard came in quite incidentally when she was being cross-examined about the condition of Mrs. Porter's health after she executed the contested will. In response to a question concerning Mrs. Porter's ability to transact business Mrs. Sullivan related the incident of their going to the bank together for the purpose of leaving the will there. Everyone concedes that the will was executed and that, if it is valid, it revoked the previous will. Whether it was placed in a safe deposit box or left with Mr. Mead, is to my mind a matter of no moment whatever.
I concur in the result.