194 Or. 429 (1952)
242 P.2d 204
IN RE ESTATE OF THEODORE URICH, DECEASED.
JURIC ET AL.
v.
SOLARI, EXECUTOR
Supreme Court of Oregon.
Argued March 11, 1952.
Affirmed April 2, 1952.
*430 Donald H. Joyce, of Portland, argued the cause and filed a brief for appellant.
Peter A. Schwabe, of Portland, argued the cause for respondents. With him on the brief was C.T. Haas, of Portland.
Before BRAND, Chief Justice, and ROSSMAN, LATOURETTE, WARNER and TOOZE, Justices.
AFFIRMED.
TOOZE, J.
This is a proceeding to contest the alleged will of the late Theodore Urich, more commonly known as Ted Urich, who died at Portland, Oregon, on January 4, 1949. The contestants are Filip Juric, a brother, Mate Juric, a brother, Ante Dzelalija, Filip Dzelalija and Ante Juric, nephews, of decedent. Ante Dzelalija and Filip Dzelalija are the sons and sole surviving issue of Maria Dzelalija, a predeceased sister of decedent, and Ante Juric is the son and sole surviving issue of Sime Juric, a predeceased brother of decedent. The proponent is Albert Solari, the sole beneficiary under the alleged will, and also executor of the estate.
*431 On January 10, 1949, there was admitted to probate in the matter of the estate of Theodore Urich, deceased, by the circuit court for Multnomah county, probate department, an instrument purporting to be the last will and testament of said decedent, and Albert Solari was named executor thereof. Letters testamentary were issued him in that behalf. Said purported will is in words and figures as follows:
"LAST WILL AND TESTAMENT
"KNOW ALL MEN, That I, THEODORE URICH, of over the age of twenty-one years, being of sound and disposing mind and memory, and not acting under duress, menace, fraud or undue influence of any person whatsoever, do make, publish and declare this my Last Will and Testament in manner and form following, to-wit:
"FIRST: I direct that my just debts and funeral expenses be promptly paid, and direct my executor to treat as an obligation of my estate, and to pay without any apportionment thereof, all estate, inheritance or other death taxes or duties imposed and made payable by reason of my death by the laws of the United States, or of any state, territory or country. If any other person shall pay any such tax, my executor shall reimburse such person;
"SECOND: All the rest, residue and remainder of my estate of whatsoever kind and wheresoever situate, I give, devise and bequeath unto my beloved friend, ALBERT SOLARI, of Milwaukie, Oregon;
"THIRD: It is my will and I hereby nominate the said ALBERT SOLARI to be executor of this my last Will and Testament, and I hereby revoke any and all wills or codicils by me heretofore made, declaring this and none other to be my last Will and Testament, and I direct that the said ALBERT SOLARI be permitted to act as such executor without bond or any undertaking of any nature whatsoever.

*432 "IN WITNESS WHEREOF, I have hereunto set my hand and seal this 31st day of December, 1948, at Portland, Oregon.
"[Sgd.] Ted Urich (SEAL)
"The foregoing instrument consisting of one page was on this 31st day of December, 1948, in our presence, signed, published and declared to be his Last Will and Testament by THEODORE URICH, who was at that time of sound and disposing mind and memory, and not acting under fraud, duress or undue influence of any person whomsoever.
"IN TESTIMONY WHEREOF, We, at his request, and in his presence, and in the presence of each other, have subscribed our names hereto as witnesses.
 "[Sgd.] Melvin C. Lewis
 Residing at: ______________
 [Sgd.] Wesley G. Lamer
 Residing at: Portland, Ore"
In their petition to contest the will, petitioners alleged: (1) that decedent did not have testamentary capacity at the time the instrument was executed; and (2) that the instrument had been executed by decedent as the result of undue influence exercised upon him by the said Albert Solari. Upon the trial, petitioners made no attempt to establish testamentary incapacity on the part of decedent, but confined their attack to the charge of undue influence. The trial court found that undue influence had been exercised by Albert Solari, and that the purported instrument was the result of such undue influence, and was, therefore, void and of no effect. A decree was entered setting aside the probate of said purported will and revoking and cancelling the letters testamentary theretofore issued to the said Albert Solari. Proponent appeals.
*433 The evidence shows that decedent was a native of Yugoslavia and came to this country in 1913, locating in Portland. At that time the parents of Albert Solari were operating a boarding house in Portland, catering to former residents of Yugoslavia. Decedent boarded at the Solari home for a period of approximately 20 years, when, because of trouble he had with proponent's mother, he was, according to proponent, "kicked out". Over that period of 20 years decedent was in and out of Portland. For the first few years he followed the occupation of logging, being away in the logging camps for months at a time. In later years he worked in foundries within the city of Portland. Albert Solari was approximately two years of age when decedent first commenced to board with the Solari family. For more than 16 years immediately prior to his death, decedent lived and boarded elsewhere within the city of Portland.
However, Albert Solari testified that the friendly relations existing between him and decedent continued over the years, and that he habitually referred to decedent as "Uncle Ted", though having no blood relationship with him. He testified:
"Q I see. Did you see him since he left your mother's home?
"A I seen Ted every week. The only time I didn't see him was the three years that I was overseas.
"Q Well, did you call on him or did he call on you?
"A Well, either way. But he was mostly out to my house, because I have a home and I have a family, and he liked to come out there. He lived in these rooming houses over town, and he enjoyed it out there.

*434 "Q Well, what was the nature of his visits? Did he stay for dinner, anything like that?
"A Oh, he stayed over the week ends.
"Q He actually slept there then?
"A Oh, yes.
"Q Over what period of years did that take place?
"A Well, I started to build my home in 1934 in Milwaukie. I had sixteen cherry trees on those two lots that I bought there. Ted was only working about two and three days a week. Days were pretty tough in the foundries then and they didn't have much work. So Ted came out there and grubbed out all sixteen of those trees, and even leveled the property to start to build my home.
"Q Did you pay him for that?
"A No, sir. I never paid him a penny.
"Q Well, did he come out to your home any time other than week ends?
"A Any time that he didn't work you would always find him out there.
"* * * * *
"A In the year 1948?
"Q Yes.
"A Oh, yes.
"Q How often would you say he visited you?
"A Well, he visited me every week as much as possible, unless I was on my vacation or something. We even went on vacations together if we could manage to get them together.
"Q You went on vacations together?
"A If we could manage to, yes, sir.
"Q Where did you go on these vacations?
"A Most of the time we'd take a trip down to the beach, and we would cut down to Eugene and stuff and head east on the McKenzie and up around through Redmond. I am quite a fisherman, and he used to like to go fishing with us.
"* * * * *

*435 "Q Did you consider him a particularly close friend?
"A Did I consider him a close friend?
"Q Yes.
"A Well, I think for somebody that didn't mean anything to me, I think he was one of the closest in accordance to relationship.
"Q Did you have any other name for him that you called him?
"A We just called him Uncle Ted. That's all. Even my little boy calls him that.
"Q Did you know he wasn't your uncle?
"A Yes; I did.
"Q You continued to call him Uncle Ted even though you knew he wasn't your uncle?
"A That's right."
The evidence discloses that, before World War II, decedent did not correspond with his family in Yugoslavia. But following the termination of the war, a correspondence was begun and continued between him and his brothers in Yugoslavia and, in particular, with his nephew Ante Juric. Ted Urich could neither read nor write and, in writing to his relatives and in having their letters read to him, was forced to rely upon two of his intimate friends, Matt Celic and Blaise Turich. Turich testified that he had written 40 or 50 letters for decedent, addressed to his brothers and nephew; Celic wrote two. Both Celic and Turich testified to reading many letters received by Urich from Yugoslavia. Decedent sent money, clothing, and other items to his kin. He manifested a special interest in his nephew Ante Juric. As to this, Blaise Turich testified as follows:
"Q Tell me this: Did Teddy say anything to you about his family and how he felt about them?
"A Oh, he did. He talked about his family all *436 the time, but he pay more attention and he like his nephew more than anybody else in the world.
"Q Which nephew is that?
"A Tony. He tell him not to go into the world blind, you know, to read and write. You know, go to school. He says, `If he listen to me, and he wants to go to college and he wants a college education, I know my brother, his father, can't afford to spend the money for him, but I will.' He said, `I don't care if it costs me the last penny I have got, but I want him to be a man.'
"Q That is the nephew, Ante, to whom some of these things have gone?
"A He says, `Old guys like I am, we going to go to Jesus pretty soon, we don't need anything, but this young man, I want to make a man of him.' He told me that many times."
As typical of the letters written by decedent to his brother Filip and to his nephew Ante Juric, we set forth one written on October 11, 1947, as follows:
"My dear Brother:
"I received your letter of September 22, 1947, and understood everything you write. I have an idea up to a certain point about your life in general there but not as to your life personally but when I understood what you write I am certain that it is so. I also know that you are well in years and that you cannot work and there are four of you in the house and no one can work and this young nephew of mine is not yet capable of working and must still go to school.
"I am sorry to hear that we lost our brother Simun while he was still young just when you needed him as well as his little Ante, but death does not look upon this. You do not write as to what caused his death. You know that I came to this country without any education not knowing so to speak my own language let alone this one here and I had a very difficult time making my living and I am over *437 54 years old and my health is not the best but a man is fortunate as long as he can earn something for his food.
"Dear brother, I am sending you by cable one hundred dollars and each dollar is worth 50 dinars, and when you receive them let me know how much time it took to arrive there so I will know.
"I think it is better that I send you money instead of buying you clothing and if I would buy it, it is not certain that it would arrive there.
"There is nothing new here to write about and I send my best regards to you, your wife, the other sister-in-law, our Ante and all of the others.
"When you write, let me know about everyting [sic] as I would like to know how it is over there.
 "Your brother,
 Tadija Jurich
 917 S.W. 3rd Ave.
 Portland, Oregon
 U.S.A."
The foregoing letter was written for the decedent by Matt Celic, and was identified by Celic on the witness stand.
Another letter of significance is that written to the nephew Ante Juric on September 12, 1948, approximately four months prior to the death of decedent. This letter was written for Urich by Blaise Turich and identified by him as a witness. It reads:
"Dear Nephew!
"I can let you know that I am, thank God, well and in good health and trust in God that this letter will find you and all of the family well and happy.
"I received your letter and understood very well what you write.
"Do not be angry for my not writing earlier. I was unable to do so as I work during the day and my friend, Blaz, works at night and we live some *438 distance apart. I sent you 2 packages. In one of the packages which I sent sometime ago there is a suit. Let me know whether you received it and how it fits you and whether it is alright. In the other package which I sent you there is a coat. Let me know whether you received it and how you like it. In the third package which I sent you there are two raincoats, barber clippers, soap and other things. Let me know whether you received it all and let me know all that you receive in the other packages.
"There is a big strike here and many people are unemployed. Who knows when it will all be settled and there will be complete peace. There is nothing new to write you but would like for you to write how it is over there, whether there is anything new and whether all of you are alive and well. Also write about anything else you wish. Let me know how your mother is, whether she is better and whether that medicine which I sent has helped her, and whether she needs more if it helps her, let me known and I shall send her more. I have that prescription and can buy it and send it at once, only if it helps her and if she needs more, write me and I shall send it immediately. Tell your mother to drink one glass of water with a little salt each morning upon arising.
"Dear nephew, I have nothing more to write now and when you receive this letter answer at once to all of my questions. Best regards to you and brother Filip, both sisters-in-law and the entire family and all relatives and friends. Blaz Juric who is writing this letter also sends his regards to all.
"Address: Tadija Juric, 919 S.W. 4th Avenue Portland 4, Oregon U.S.A."
The evidence shows that Urich became ill with pneumonia about December 30, 1948, and entered the Physicians & Surgeons Hospital in Portland. He was *439 an extremely ill man, and oxygen was frequently administered to him in the hospital.
On December 30 one Melvin C. Lewis (whose surname was formerly Solari), a brother of Albert Solari, the proponent, discovered that Urich was in the hospital. About 2:30 p.m. of that day, Lewis went to the hospital to see him. As to what then occurred, Lewis testified:
"* * * So I went up to the Physicians' and Surgeons' Hospital and talked to him. He was in bed and he wanted to know if I would shave him, and that he hadn't had a shave for three or four days. So I told him I would when I come back that evening. So he wanted me to get ahold of Albert, and so I said, all right, I would. So I contacted Albert where he works and asked him to meet me and we would go to the hospital together that evening, and that I was to shave him and we would visit with him awhile."
On December 31, Lewis and his brother Albert were at the hospital. At that time the matter of decedent executing a will was discussed. The evidence discloses that Lewis telephoned Donald H. Joyce, an attorney of Portland, and having reached him, turned the telephone over to his brother, who gave Joyce the directions for preparation of the will. Joyce prepared the will as directed and took it to the hospital, where it was executed, with Lewis and one Wesley G. Lamer, administrator of the hospital, signing as witnesses. Joyce did not know Urich, nor did he talk with him. According to the testimony of the subscribing witnesses, the will was read to the decedent both in English and in his native tongue. Both testified to testamentary capacity. When the will was executed, there were present the decedent, Joyce, Lewis, Solari, and Lamer.
*440 The testimony of Lewis and Solari with respect to the preparation and execution of this purported will is somewhat enlightening. Lewis testified:
"Q Was it you or your brother that asked Mr. Joyce to come up there?
"A I asked him to come up there.
"Q You asked him to come up there?
"A Yes, sir. Mr. Joyce is my attorney in my business.
"Q Who did you say was in the room at the time this will was signed?
"A Well, just like I said. I don't know whether he was a manager or who, of the hospital.
"Q That is the other witness to the will?
"A Yes, sir.
"Q So there was Albert and Mr. Joyce and you and then this other gentleman that signed as a witness?
"A Yes, sir.
"Q How did he happen to be in the room?
"A We asked him.
"Q Oh, you asked him to come in?
"A Yes, sir.
"Q How long was this other gentleman in there?
"A Well, I think he was just in there for the purpose of witnessing."
Solari testified:
"Q No. Now, you heard your brother testify here about having gotten Mr. Joyce on the 'phone, and then he turned the 'phone over to you and you told Mr. Joyce to prepare a will making you the sole beneficiary. Was that correct, what your brother stated?
"A I am not following anything like that. You ask me the question right and I will answer it right.
"Q I am not asking you to fall into anything, Mr. Solari. You were here and your brother testified *441 as to what happened, and I asked you if that was correct?
"A No.
"Q It isn't?
"A No.
"Q What your brother testified to wasn't the truth; is that right?
"A No; I am not saying that.
"Q Well, it just isn't right?
"A It isn't right.
"Q What is the right about it?
"A My brother didn't have an attorney, and I did. So he got ahold of the attorney. And so the attorney asked him what he wanted to know.
"Q Asked who?
"A Asked my brother. So my brother says, `I will turn the 'phone over to you.' I took the 'phone, and Don asked me what the man's name was, where he worked, what he wanted to do; but I didn't tell Don how to prepare the will. I never told anyone how to prepare anything.

"Q What did you tell Don to put in the will?
"A I just told Don the man was very sick, that he wanted me to be the sole beneficiary; and that is all I told the attorney to do, and he fixed the rest of the will.
"Q Did Teddy tell you to put yourself in as executor without bond?
"A Without bond?
"Q Yes.
"A Well, the way it was  No; he didn't tell me anything like that. The way it was, he wanted me to scratch it out on a piece of paper, and I told him that you couldn't do that, that it was no good. He says, `What I do'? I says, `The best thing to do is contact an attorney.' And he says, `I don't know an attorney.' And my brother says, `Well, I have an attorney.' And from there you know it.

*442 "Q So you called Donald Joyce up and told him to make a will for Ted Urich and making you the sole beneficiary?
"A No; I did not call Donald Joyce up. My brother called Donald Joyce up.
"THE COURT: Just a minute. I want to get this clear. This is important. Your brother, Melvin, testified he called Mr. Joyce, and Mr. Joyce wanted to know what he was to do, and he couldn't explain it to him, so he put you on the 'phone. Did he do that?
"THE WITNESS: Yes; he did.
"THE COURT: The point is, someone had to tell Mr. Joyce the terms of this will  that is, what disposition he wanted to make of his property. In other words, who was to be the beneficiary, who was to receive his property. Now, from what has been said here, I assume Mr. Joyce prepared this typewritten will before he came to the hospital. Now, how could he prepare a will setting forth all these things that are in here unless someone told him the name of the testator, that is your Uncle Ted, as you call him, also to whom Ted wanted to give this property, all those matters? Who told him that?
"THE WITNESS: I told him.
"THE COURT: You told Mr. Joyce. That is what I wanted to get at.
"THE WITNESS: I told him." Italics ours.)
Solari admitted that he did not inform any of Urich's friends of his serious illness. He also said that following decedent's death he examined all of his effects, and that he did not find any letters addressed to decedent from his family in Yugoslavia. He further asserted that at no time did decedent ever mention anything to him about his brothers and nephews. This is his testimony respecting those matters:
"Q You looked through his personal effects and *443 you found no letters whatever from any members of his family; is that right?
"A No. Haven't got any.
"Q Did you take charge of his suit case?
"A Yes.
"Q Did you go up to his room at the Hyland Hotel and clean out the room?
"A Yes; I did.
"Q And you didn't find a single letter from a brother or a niece or nephew or anybody?
"A No; not that I can recall, I haven't found any.
"Q Did you know that just a short time before his death Teddy was sending medicines over to his people and sending shoes and clothes and money over to them?
"A Well, Ted has always confided everything into me. Now, if he was doing it, he was doing it on the side. I didn't know anything about it.
"Q He never mentioned to you having a father in the old country that died in 1926? Never told you about the two brothers that are still living and the brother that died in 1946?
"A He never told me about any of his family.
"Q As far as you knew, he didn't have any people at all, any relatives?
"A That's right.
"Q Did you know a friend of Teddy's by the name of Blaise Turich?
"A No; I don't.
"Q Did you ever know of a friend of Teddy's by the name of Matt Celic?
"A Yes; I guess I have.
"Q Did you let any of Teddy's friends and countrymen know that he was sick and in the hospital so that they might go and see him?
"A Did I let any of his friends know?
"Q Yes.
"A No."
*444 Contestants maintain that, under the facts and circumstances of this case, a confidential relationship existed between proponent and decedent. They claim that this fact, combined with the part played by proponent as sole beneficiary under the will in the preparation and execution thereof, and the other circumstances disclosed by the evidence, created a presumption of undue influence, and that the burden of proof shifted to proponent to overcome that presumption by a preponderance of the evidence, which, they assert, he failed to do.
1. We are of the opinion that a confidential relationship did exist between Albert Solari and decedent at the time this alleged will was executed. Decedent was seriously ill. He had no relatives living in Portland. No friends, other than Solari and his brother, were near at hand to advise or to help. He had no independent legal advice. He was compelled to rely upon and trust them, if he was to place his dependence upon anyone; there was no one else. They owed him a duty of utmost good faith. In 57 Am Jur, Wills, 281, § 390, it is said:
"* * * At least, the presumption of undue influence is raised where such circumstances are combined with the existence of a confidential relation between the testator and the beneficiary who was thus active in drawing the will. The rule embraces both technical fiduciary relations and those informal relations which arise where one man trusts and relies upon another. Any relation existing between parties to a transaction wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other is a confidential or fiduciary relation within the rule." (Italics ours.)
2. Proponent, in his brief, says: "There is absolutely no direct evidence of undue influence in the *445 record in this cause." If direct evidence were essential to the proof of undue influence, it is doubtful that a successful attack upon a will on that ground could ever be made. The law does not make that requirement. Undue influence may be, and it generally is, established by circumstantial evidence. In the case of In re Porter's Estate, 192 Or 483, 235 P2d 894, 897, we said:
"This court has repeatedly stated that `undue influence is a species of fraud' and, like fraud, `is rarely susceptible of direct proof.' Those who undertake to substitute their will for that of a testator do not ordinarily shout their plans or advertise their actions from the housetops. They usually operate surreptitiously. For those reasons, evidence has a wide range where undue influence is charged and, in most cases, is established by proof of circumstances from which the inference of undue influence is drawn."
Also see Newman v. Stover, 187 Or 641, 213 P2d 137; 2 Page on Wills, 595, § 812; Rood on Wills 2d ed, 149, § 190.
3-5. Ordinarily, the burden of proof of undue influence is upon the party who asserts it. But there may be circumstances which cast upon the beneficiary the burden of disproving undue influence. Each case must be decided upon its own peculiar facts. There is no fixed rule that is decisive in all situations. If confidential relations are shown to exist between the testator and the beneficiary, slight evidence of additional facts may be sufficient to shift the burden to the beneficiary to disprove undue influence. In re Porter's Estate, supra; Trombly et al. v. McKenney, Ex., et al., 191 Or 90, 108, 228 P2d 417; Allen v. Breding, 181 Or 332, 181 P2d 783; 2 Page on Wills, 607, § 814.
6. In the instant case, in addition to the evidence disclosing a confidential relationship between the testator *446 and the sole beneficiary under the will, there is abundant evidence of strongly suspicious circumstances giving rise to a well-founded belief that undue influence was in fact exercised upon decedent by proponent, and that, by reason thereof, the testator was induced to execute the instrument which, although his, in outward form, is in reality not his will at all, but the will of the beneficiary. Such an instrument, in legal effect, is not a will at all. In re Porter's Estate, supra; 1 Page on Wills, 368, § 184.
What are some of those suspicious circumstances?
First, and perhaps most important, is the fact that Solari actively participated in the preparation and execution of the proposed will. He secured the services of his own attorney in that connection; an attorney who did not know the testator, and who held no communication whatever with him prior to the will's execution. He gave the only information given to the attorney as to what the contents of the will should be. He admitted that the testator had not told him to have himself appointed as executor to serve without bond, yet he told Joyce to put that in the will. He personally read the will to the testator in his native tongue. He had his brother sign as one of the witnesses, and arranged for the attendance of the other. The testimony does not disclose that testator actually requested either to act as a witness.
In the second place, Solari and his brother kept close tab on the testator for several hours immediately prior to the will's execution, and never notified any of testator's other friends of his condition, nor suggested that the decedent have some independent advice. Under the circumstances, good faith and fair dealing would seem to have demanded that proponent arrange for such independent advice before accepting testator's *447 offer to make him the sole beneficiary of his estate. In re Chesney's Estate, 102 Cal App2d 708, 711, 228 P2d 46, 48; 2 Page on Wills, 646, § 834.
Moreover, it is more than passing strange that at no time did Urich tell Solari about his relatives in Yugoslavia, if Solari is to be believed when he describes the close, confidential relationship existing between himself and decedent. In view of the intimate relationship as outlined by Solari, it is indeed odd that at some time Urich did not ask him to write a letter, or to read one he had received, or aid him in sending money and supplies to Yugoslavia, instead of relying entirely in those respects upon his friends Turich and Celic. This alleged silence on the part of Urich, if in fact there was such silence, just doesn't make sense; it does not square with the course of ordinary human conduct. Such testimony, in and of itself, creates a substantial doubt as to its accuracy. Did Solari deny all knowledge of the existence of decedent's relatives because of some theory he had that lack of such information would benefit him in this cause? For example, would it serve as an explanation of his failure to speak of those relatives when testator suggested a desire to make a will? Or was his story about the close, friendly relations existing between himself and Urich a mere figment of his own creation? His claim to close friendship is understandable, as that seemed most necessary to explain the fact of his being named the sole beneficiary. Urich only could have answered these questions, but his lips were sealed in death.
Furthermore, there is no doubt that Urich received many letters from his relatives during the latter years of his life. It seems improbable that he destroyed all of them, particuarly, those from his favorite nephew. *448 Yet, according to Solari, when he went through decedent's belongings, he did not find even one of these letters. That is difficult to believe. In the light of all the other facts and circumstances in the case, the inference may well and justly be drawn that he did find some of those letters and, to protect his own interests, either destroyed or secreted them.
We also deem it a very suspicious and unnatural circumstance that, in making his will, the testator forgot entirely about his family in Yugoslavia, whose welfare had so recently been of such manifest interest and concern to him, and bequeathed his entire estate to an alleged friend. If testator, in truth and in fact, intended to by-pass his relatives in favor of friends, why did he overlook his closest friend, Blaise Turich; the man who wrote and read so many letters for him, and who assisted in getting together and mailing the clothing and other items which were sent at different times to members of the family in Yugoslavia?
And finally, it must be borne in mind that, at the time this alleged will was executed, decedent was dangerously ill; he was weak in body and without doubt somewhat affected mentally, though not to the extent of producing testamentary incapacity. But in his poor physical condition he obviously was much more subject to being influenced than would have been the case, had he been well. In In re Brown's Estate, 165 Or 575, 585, 108 P2d 775, the late Justice BELT said:
"The strength of the presumption of undue influence depends upon the particular facts and circumstances in each case. It varies with the strength or weakness of the mind of the testator. Of course, it requires much less influence to control the will of a person of weak mind and infirm purpose than that of one of vigorous intellect and determined *449 character. As stated in 1 Woerner's American Law of Administration, 60:
"`What degree of influence will vitiate a will depends much upon the bodily and mental vigor of the testator, for that which would overwhelm a mind weakened by sickness, dissipation, or age might prove no influence at all to one of strong mind in the vigor of life.'"
It is unnecessary for us in this opinion to review our former decisions wherein the question of undue influence was involved. The rules of law respecting that question are firmly established in this state. They are discussed quite fully in In re Porter's Estate, supra. However, we do wish to commend counsel for proponent for the ingenuity he displayed in the preparation of the very helpful chart attached to appellant's reply brief, in which our prior decisions in will-contest cases are analyzed.
7-9. Under the facts and circumstances of this case, and the rules of law applicable thereto, the proponent had the burden of disproving undue influence. The conscientious and experienced trial judge found that the alleged will was not in fact the last will and testament of the said Theodore Urich, deceased, but was the result of undue influence exercised upon the testator by Albert Solari and other persons acting under, for, and through him. The trial judge heard the witnesses testify and was able to observe their conduct and demeanor on the witness stand. His conclusions are entitled to great weight. They should not be disturbed on this appeal.
The decree is affirmed.