Argued June 5, reversed and remanded August 13, petition
for rehearing denied September 9, 1952

# SIZEMORE, as Adm'r *v.* ARMINTHA MILLER AND EUGENE MILLER

247 P2d 224

*Pat H. Donegan,* of Burns, argued the cause for appellant. With him on the briefs was C. B. McConnell, of Burns.

*Anthony Yturri,* of Ontario, argued the cause and filed a brief for respondents.

Before BRAND, Chief Justice, and HAY, LATOURETTE, WARNER and TOOZE, Justices.

LATOURETTE, J.

Otus Sizemore, as administrator with the will annexed of the estate of Tice Shull, deceased, brought the present suit to set aside an alleged contract for the sale of Shull's land to defendants, Miller and husband, and an alleged partnership agreement between them involving Shull's cattle, on the grounds of mental incompetency on Shull's part, fraud, undue influence and failure of consideration. The trial court found for the defendants; hence this appeal.

Shull, at the age of 74 years and being the owner of some 800 acres of land in a remote part of Harney county, on May 6, 1946, leased said land, including his livestock comprising some 100 head, for a period of five years to defendant, Armintha Miller, the rental to be one-half of the increase of the livestock. At the time of the execution of such lease, Mrs. Miller was 31 years of age and was a well-educated woman, having attended high school in Arizona and having been graduated from Arizona State College after a four-year

course in journalism. After the 1946 lease was entered into, Shull continued to live in the dwelling house on the premises leased to Mrs. Miller. There were no near neighbors, and the Millers were the principal persons with whom Shull had social contact during the time. It is admitted that there was a close and intimate relationship between the parties. During Shull's last illness, immediately preceding the signing of the documents in contest, the Millers were looking after Shull, procured medicine for him, took him to the hospital in Lakeview rather than in Burns, and obtained the services of the Miller's physician, Dr. Kliewer, for him. Shull's regular doctor practiced in Burns. In their brief the Millers state: "They were the persons to whom he turned for help, * * *." That there was a confidential relationship between the Millers and Shull cannot be doubted; in fact, the trial court so found in the following language:

"* * * When he had his last illness, the first persons that he turned to were the Millers. Now that is more or less natural, for the reason that the Millers were the closest people to him; but it shows there a strong friendship, it shows a confidence, it shows in this evidence the persons to whom he could turn for his assistance."

Shull was admitted to the hospital in Lakeview on June 16, 1950, and, although Mrs. Miller at least knew that Shull had a daughter, Mrs. Gladys Sweeny, she gave the hospital authorities the name of Minnie Sutherland without designating her relationship to Shull for the hospital's records. Minnie was Shull's sister.

In June, 1946, Shull was visiting his daughter in Nevada, at which time he became ill and was hospitalized, thereupon he executed a will leaving everything to her but naming her son as executor. Shull

and his daughter were on friendly terms, visited back and forth, and as soon as she learned of his illness in the hospital, she went immediately to Lakeview.

The record shows that Mr. C. B. McConnell, of Burns, was Shull's attorney and had drawn the 1946 lease, and that prior to Shull's entrance into the Lakeview hospital, Mrs. Miller went to Mr. McConnell's office for the purpose, according to her, of having him draw the documents in question. She claims she became suspicious of Mr. McConnell and left his office without procuring the necessary papers.

The day after Shull was admitted to the hospital, the Millers obtained through their personal attorney, Mr. Theodore Conn, of Lakeview, two written documents and had Shull execute them. Mr. Conn never talked to Shull, and not having the description of the real property, called a county official at Burns to get the necessary description to enable him to prepare the contracts in question. One was an agreement on the part of Shull to sell his ranch to the Millers for the sum of $2,500, payable $300 per year without interest. Under the terms of such agreement, Shull agreed to pay a $2,500 mortgage on the premises which bore 5 per cent interest and which was then due but which had been extended for a period of one year. This mortgage was held by Otus Sizemore who was later appointed administrator of Shull's estate.

The second document was a partnership agreement whereby Shull turned over the ownership of two-thirds of his cattle to the Millers, it being understood that the partnership should continue for a period of six years, and that the parties should run jointly and together all of the cattle belonging to Shull and should each share equally in the profits and bear equally the losses in the operation of said cattle ranch and each

bear equally the expenses of such partnership opera-
tion. It was agreed that the Millers should do all of
the necessary work and labor and furnish the range
in connection with the operation of the cattle ranch,
but the expenses of taxes and the procuring of hay and
other feed should be borne equally between the parties.
It was further agreed that there should be an annual
accounting between the partners, and that partnership
books should be kept.

It is important to note that in the partnership
agreement Mrs. Miller contributed nothing in the way
of turning over her portion of the cattle, being the
increase from the parent herd, to the partnership. Of
this the trial court said:

> "It then brings us down to the third question,
> which becomes much more difficult for the Court
> to determine, and that is the inadequacy of the
> consideration for the transactions that took place
> on that day in the hospital at Lakeview. Particu-
> larly the contract on the cattle does have one very
> odd clause, and I think it is the one which is giving
> the Court more consideration, more difficulty of
> determination, than any other one point; and that
> is where Tice Shull turned over two-thirds of his
> own cattle to Armintha and Eugene Miller and
> that there Armintha Miller withheld from that
> partnership the property that she had gotten
> through the benefit of the 4-year contract with
> Tice Shull. If that had been left out of this, the
> Court would not have had much difficulty in de-
> ciding this case, whether the Court would have
> been right or wrong."

The court in his opinion did not explain how he over-
came this difficulty in reaching his decision.

It must be noted that at the time these documents
were signed in June, 1950, there was subsisting a lease
between Shull and Mrs. Miller concerning the cattle

and the land which had not then expired but had up to May, 1951, to run.

The daughter, Mrs. Sweeney, shortly after the execution of these documents, was apprised by the sheriff over the telephone that things were not as they should be between her father and the Millers over the property in question and that he was in the hospital, and she immediately went to Lakeview to see her father. She there learned from her father that he had executed some documents, the purport of the same, according to her testimony, not being known to him. No papers were left with him so Mrs. Sweeney went to see the Millers' lawyer, Mr. Conn, who had drawn up the documents, and he refused to divulge the nature of them to her. She thereupon went to another attorney in Lakeview and had him prepare an order, which her father signed, demanding possession of the documents in question. Again the attorney refused to turn over the papers. We do not believe that Mr. Conn's actions in this case call for censure. He was employed by the Millers and not by Shull to draw the documents and was accountable only to them for his demeanor.

Later Mrs. Miller arrived at the hospital, whereupon Mrs. Sweeney made demand of her for the papers. Demand was again refused, and Mrs. Miller became so profane and abusive toward Mrs. Sweeney that she, Mrs. Miller, was ordered from the hospital by the superintendent. Shull lingered on with his illness until on July 6, 1950, he was removed to a Portland hospital by the local mortician where he died the next day with cancer of the rectum. The will making the daughter the beneficiary was admitted to probate, and Sizemore was appointed administrator with the will annexed, whereupon the present suit was instituted.

Before proceeding further, it must be noted that within three days after the partnership agreement was entered into between the parties the Millers sold a goodly number of cattle belonging to the partnership. In this respect, it is difficult to understand how the Millers could carry out their obligations under the partnership by such disposition of the partnership cattle.

■ The trial court found that Shull, at the time of the execution of the instruments involved, was mentally competent, and on this question, since there was considerable contradiction among the witnesses, we must adopt the finding of the trial court since he had an opportunity to observe the witnesses on the stand, although we are very much impressed with the testimony of Dr. Kliewer, the Millers' physician, who testified that it was his belief that Shull was incompetent and had the mind of a child 16 years of age, suffering from arteriosclerotic dementia.

■ As to the undue influence feature of the case, the trial court found that there was no word of testimony indicating undue influence up to the 17th day of June, 1950, and that a fondness for the Millers motivated him in the signing of the documents in question.

There is no claim in the answer of the Millers that Shull made a gift of two-thirds of the cattle to them. Their plea was that the agreements were entered into based on valid consideration.

In arriving at the above conclusion, the trial court overlooked the principle of law, which is well-established in this jurisdiction, that where a confidential relationship exists between parties, when taken in connection with other suspicious circumstances, an inference of undue influence may be justified so as to require the beneficiary to proceed with the proof and

present evidence sufficient to overcome the adverse inferences, and that slight evidence is sufficient to set aside an agreement between them on the ground of undue influence. *Ingraham et al. v. Struve, exec., et al.,* 54 Adv. Sh. 1347, July 3, 1952; *In re Southman's Estate,* 178 Or 462, 168 P2d 572.

When transactions are secret and hidden from the light of day, suspicion is immediately aroused, and the burden rests upon the beneficiary to dispel the doubts, and this is true where there are intimate relations between the parties, or where the beneficiary has drafted or advised the terms of the instrument. *Legler et al. v. Legler,* 187 Or 273, 211 P2d 233; *Miller et al. v. Jeffery et al.,* 129 Or 674, 278 P 946.

■ There is another principle of law applicable in the present case, and that is where inadequacy of consideration is so gross that it shocks the conscience, it furnishes satisfactory and decisive evidence of fraud and is sufficient for setting aside the agreement. *Sherman v. Glick,* 71 Or 451, 142 P 606; *Owings v. Turner,* 48 Or 462, 87 P 160; *Archer v. Lapp,* 12 Or 196, 6 P 672.

■ The Millers made very little effort to justify the contracts. In this regard Mrs. Miller testified as follows:

"Q Well, even if the land were only worth $2500, Mr. Shull would be at a disadvantage by the signing of this agreement for the reason that he would have to pay off this $2500 mortgage virtually immediately and then wait 8 years to get the money back from you, and you weren't to pay him any interest. Can you tell me what benefit the man got by signing that instrument?

"A I don't know how to tell you. I don't know how to explain your benefits. Mr. Shull certainly would have had no taxes to pay on his place, and his taxes more than covered what the interest on his loan would have amounted to, I would think.

"Q He wouldn't have had any taxes to pay because he wouldn't have had any place, Mrs. Miller. Now under the original lease, Mr. Shull owned all of the cattle and one-half of the increase, didn't he?

"A Yes.

"Q Now on the 17th day of June he signed a paper, Exhibit 2 in this trial, and by signing that paper he transferred two-thirds of his cattle to you and your husband and two-thirds of the increase from that time on and obligated himself to pay one-third of the cost of the operation. Can you tell me what benefit Mr. Shull got by signing that kind of an instrument, Mrs. Miller?

"A Well, Mr. Shull didn't think he would lose by it, and one-third of the expenses would have been very, very small.

"Q You say Mr. Shull didn't think he would lose by it? Can't you explain your testimony any more thoroughly than that?

"A I don't know how to explain it. I don't know what you want me to say."

After reading the entire transcript consisting of 791 pages and the briefs of the parties, we are at a loss to determine what benefit Shull received from the transaction. He parted with his land without consideration and really lost money on the transaction as he obligated himself to pay the $2,500 mortgage, plus 5 per cent interest, whereas he was to obtain only $2,500 from the Millers over an eight-year period without interest. As to the original contract with Mrs. Miller, he was entitled to enjoy the benefits of the same for practically another year, deriving from the same one-half of the increase of the cattle. By the partnership agreement, he gave two-thirds of his cattle to the Millers and was to be given only one-third of the profits instead of one-half.

That the partnership contract was not entered into

in good faith by the Millers is quite evident from the fact that within three days after the agreement was entered into the Millers sold a major part of the partnership cattle, thus depriving them of the ability to fulfill their obligations under the partnership agreement which had six years to run.

There can be no explanation of these transactions other than fraud and undue influence. It must be remembered that Shull was on very friendly terms with his daughter, had executed a will in her behalf, and it is unreasonable to assume that he would practically deplete his entire estate and deprive her of her just and natural rights unless there had been some overreaching on the part of the Millers.

■ There are many circumstances in this case which point to undue influence: the taking of Shull to the Lakeview hospital and the calling in of the Millers' doctor when there was a hospital at Burns where Shull's personal physician practiced; the failure of the Millers to have Mr. McConnell, Shull's attorney at Burns, prepare the documents and instead having their own attorney, Mr. Conn at Lakeview, draw the agreements in question; the hurried execution of the agreements the day after Shull was taken to the hospital, he at the time being aged and in a weakened condition; the lack of necessity for an additional contract for the running of the cattle when one already existed with practically a year yet to run; the one-sided partnership agreement with no benefit to Shull but of decided benefit to the Millers; the selling of the cattle by the Millers within three days after the execution of the partnership agreement; the execution of the agreements in the hospital in the presence of the Miller clan and their doctor but with no one representing Shull or looking after his interest in the transaction; failure of consid-

eration moving to Shull in the land contract and, in reality, a detriment to him, as hereinbefore pointed out; and the respective positions of the parties—on the one hand, Mrs. Miller, a highly-educated woman, and, on the other, Shull, a lonely recluse with little or no education. These, with other circumstances shown by the record, point to the inequitableness and unjustness of the whole transaction, and all cry to high heaven and call for relief from a court of equity.

We have considered all the evidence in the case and the decisions cited by the respective parties. There has been much law written on the subject under discussion, but it is axiomatic that every case must stand or fall on its own set of facts. We have carefully scrutinized the evidence, and especially that on which defendants based their case, and are of the opinion that the facts in the instant case justify a rescission of the contracts in question.

The decree of the trial court is reversed, and the land contract and partnership agreement are set aside. From the record before us, it is impossible for us to ascertain with any degree of certainty the number of cattle involved in this litigation so that a proper accounting may be had between the parties. The case, therefore, will be remanded with instructions to proceed to an accounting and, thereafter, an appropriate decree be entered under the circumstances.

There is some claim made in this case that Shull loaned to the Millers certain sums of money. We do not adjudicate on this question because the record likewise is incomplete on this feature of the case. We are of the opinion, however, that since such a claim is of legal cognizance rather than equitable, it should be settled in a law action rather than in the present suit.

Reversed and remanded.