Argued March 18, affirmed May 13, petition for rehearing
denied May 27, 1953

In re Estate of MANILLUS DAY, Deceased
DAY et al. *v.* HARKEY

257 P. 2d 609

*Glenn R. Jack* and *James O. Goodwin,* of Oregon City, argued the cause for appellant.

*George P. Winslow,* of Tillamook, argued the cause and filed a brief for respondents.

WARNER, J.

This appeal is from a decree invalidating a document tendered as the last will and testament of Manillus R. Day, deceased, and declaring that the decedent died intestate.

The decedent's heirs and next of kin consist of cousins and second cousins, all of whom are parties to this proceeding. The 12 first cousins appear as contestants. Decedent's second cousins, 5 in number, were impleaded as defendants.

Leo Clyde Harkey, as the sole beneficiary under the will and as its nominated executor, is the proponent and alone prosecutes this appeal from the decree of the circuit court.

The contestants represent that Day was not only mentally incompetent to execute the instrument offered in probate but was unduly influenced to make the provisions he did in response to the persuasions of Harkey. The lower court found that a confidential relationship existed between Harkey and Day and that the challenged instrument was the product of this undue influence of the proponent.

The following is a composite statement of facts and circumstances either undisputed or sustained by a preponderance of the evidence:

Manillus Day at the time of his death on or about June 17, 1950, was 51 years of age. Prior thereto he

had been in apparent robust health. He left an estate worth approximately $18,000. Day had never been married and for a good many years lived alone in a cabin on an 80-acre tract near Bay City in Tillamook county. He was highly temperamental, capable of violent anger and given to certain eccentricities. Although running water and electricity were easily obtainable, he lived without them and denied himself toilet facilities of any kind. Notwithstanding that the decedent did not attend social functions, he maintained a friendly accord with his immediate neighbors.

Day's mother died May 29, 1950, just 18 days prior to the execution of the will now being contested. Her death wrought a very disturbing influence in his life, particularly insofar as it cast upon him problems relating to the probate of her estate and through which he acquired a very substantial portion of his own estate. This in part reflects his antipathy for handling his own business affairs and his want of knowledge of the conventional ways of dispatching matters relating to the administration of estates.

Acting on the advice of Harkey, Day chose Warren A. McMinimee from one of two persons suggested by Harkey to act as attorney for him in his capacity as administrator c.t.a. of his mother's estate. Shortly before his death, he expressed to Harkey his satisfaction with that choice.

We find that only two days before he signed the will making Harkey his sole beneficiary, he further evidenced his confidence in McMinimee by his direction to that attorney to prepare a will for him to execute, wherein he proposed to give one half of his estate to Harry McCuen, a first cousin and one of the contestants herein, and one half to Bernice Wilkins, a long-time

friend of his family, with token bequests to two other ladies, one being Mrs. Morrison, who lived just across the road from his cabin. His guns were to be given to Evans Platt. This was followed by a very significant event which took place about noon of the day he signed the will now in question. At that time he again called at McMinimee's office in Tillamook to advise him of a change in his previous planning to the extent of giving Mrs. Bessie Williams, the person who had cared for his mother in her last days, one half of what he received from his mother's estate. It was apparently his then intention to make a gift of this one half to Mrs. Williams as soon as the property of that estate was available for distribution and by way of rectifying a previous grievous error in his judgment concerning her.

Leo Harkey, the proponent, was an agent for the American Express Company in Tillamook and lived not far from Bay City. His home was about a quarter of a mile down the road from the Day cabin. Harkey had moved into that community about two and a half years before the decedent's death. Day and Harkey soon thereafter became friends, and we discover Day frequently assisting the Harkey family in many neighborly services by way of helping them to establish themselves in their new location.

The cardinal date in this matter is June 16, 1950. For what took place in Day's home on the evening of that day we are dependent entirely upon Harkey's testimony. A few days prior, Day had expressed himself to Harkey as greatly concerned about his failure to have made federal income tax returns for the four prior tax years. He seemed to believe that he was in "an awful mess" as a result, with possible liability

to penal action. Harkey attempted to reassure him that he was not in danger of being jailed and, at the worst, would probably have to pay only a cash penalty. Harkey promised Day that he would make further inquiry in his behalf from a deputy collector of internal revenue who was Harkey's friend.

Late in the afternoon of June 16, about 5:30 p. m., the appellant called at Day's home to inform him of what he had learned from his friend, the deputy collector, and to assuage further Day's fears concerning his tax situation. When he arrived, he found Day in a state of considerable agitation and concern over alleged rumors which the decedent said he had heard that day to the effect that he, Day, was a "Peeping Tom." Harkey represents Day as so greatly overwrought and humiliated by these reports that he had determined to leave the community that night for parts unknown, but not before he had given Harkey everything he owned and which he then pressed upon him. According to Harkey, he spent about 20 or 25 minutes arguing with Day, trying to reassure him that the stories were of no consequence and to dissuade him not only against his proposal to leave the country but also against his offer to vest Harkey immediately with title to all his property. It resulted only in Day's insistence that an attorney be hired to draw a will in favor of Harkey.

We interpolate here to note that a half hour appears to us as a remarkably short space of time to minister to the anxieties of one as mentally confused and distressed as Harkey pictures Day to have been at that time, especially when we realize that Harkey had to divide his 20 or 25 minutes into explaining the income tax situation, discrediting the "Peeping Tom" rumors and allaying Day's apprehensions concerning them, per-

suading Day to abandon his determination to leave forever the familiar environments in which he had dwelt for a lifetime, to say nothing about the time he would necessarily have expended in arguing against Day's insistence that he endow Harkey then and there with all his earthly possessions of a value proximating $18,000 and, in so doing, no doubt pointing out to him that Day had other relatives and friends who were better entitled to his bounty than he, Harkey. The speed with which these matters of major magnitude were resolved in terms of Day's importunities and contrary to Harkey's protestations gives rise to a grave doubt concerning the credibility of Harkey's testimony of what was actually said and done during that momentous and so short interview between Harkey and his deceased benefactor. However, as we know, Day apparently overcame Harkey's "resistance"; and he finally harkened to his friend Day's directions and with equal and surprising speed moved immediately to translate them into a semblance of reality. His first act was to secure the services of an attorney to prepare a will in accordance with Day's directions.

During his meeting with Day, Harkey tells us that he was enjoined by the decedent to treat the stories concerning his alleged "Peeping Tom" activities with confidence, as well as his plans to flee to parts unknown. We observe, however, that there is no evidence other than Harkey's that Day was in fact disturbed by these rumors.

It seems appropriate here to record that approximately 30 minutes before Harkey called upon Day, Day, on his way home from Tillamook, had stopped his car in front of the house of a nearby friend, neighbor and confidante of many years, Mrs. Morrison. She is the

same person whom, two days before, he had instructed
Mr. McMinimee to include as one of the beneficiaries
in his will. She was then working in her garden, where
he joined her. His mental attitude at that time is one
of such striking contrast to what Harkey claims he
discovered within the next half hour that we quote
from Mrs. Morrison's testimony as follows:

"Q Did you talk to him then about—I will put
it this way: Did you have any discussion at that
time about his business affairs being in good shape
and so forth?

"A Yes, he said he felt very much better, he
felt he had things straightened out. The way he
worded it, 'I feel much better about it.'

"* * * * *

"Q And he seemed to express that everything
was right with the world at that time? You had
that feeling then?

"A Yes, he seemed to be feeling much better.

"Q Now did he go and get you some bean poles
that afternoon?

"A He got two. He couldn't find the others. He
said he would get the others in the morning.

"Q He would bring them over in the morning, is
that right?

"A That's what he said."

Coincident with his departure from the Day cabin
on that fatal night, we find Harkey enveloping all of
his subsequent activities with a veil of secrecy and
dedicating himself to their earliest possible accomplish-
ment with the same tempo of expedition that seems
to have characterized his conference with Day only a
few moments before. Harkey went directly to his own
home and there called a Tillamook attorney who not
only did not know Day but had never seen him before.
This was between 5:30 and 6:00 p. m. Harkey did not

give the attorney the name of the prospective testator until after they met at Idaville by appointment and never confided to him Day's pressing anxieties and distracted state of mind until after Day's death. This is a circumstance which, in our opinion, tends to mitigate the situation flowing from the attorney's failure to observe the conventions and practices which the profession customarily follows when drawing a will.

When Harkey called the lawyer who subsequently responded to his request, he well knew that Mr. McMinimee was acting as Day's counsel. The evidence discloses that McMinimee was then available and could have been reached at his office, but we are satisfied that Harkey made no effort to establish a contact with him.

The Tillamook attorney of Harkey's choice was under the pressure of another engagement that evening but, upon Harkey's pressing insistence, drove to the Idaville store, a point near Harkey's place, where he was met by the proponent who conducted him to his residence. This meeting between the two men was near 6:30 p. m., approximately one hour after Harkey had gone to Day's home to convey the information he had received from the deputy revenue collector concerning Day's income tax liability.

Enroute to the Harkey place they passed the Day cabin without stopping. It was not, however, until they reached the Harkey home a few minutes later that the proponent communicated to the attorney Day's wishes and directions regarding the contents of the projected will. This was testified to by the attorney substantially as follows:

"A The conversation was something like this: Mr. Harkey said that there was a bachelor there

in the neighborhood, a neighbor who for some reason had taken a personal liking to him and had told him that he wanted to make a Will out in his favor, and that this bachelor was not married, had no mother or father living, or brothers or sisters, but that he did have some cousins up around Nehalem but that he was not intimate with the cousins and did not wish to leave anything to them and that he wanted provision in the Will about if any of the distant relatives should contest the Will they would be given a bequest of one dollar and then came the discussion about, I said, 'Well, we would need an attesting witness outside the family.' Then came the discussion, they said, 'We will get Mrs. Leach and see if she can come.' And one or the other— and as I recall it was Mrs. Harkey—called Mrs. Leach. That is just about all I can recall of the conversation of what should go in the Will.''

The lawyer retained by Harkey then proceeded to draw a will according to these directions, using a portable typewriter which he had brought with him for that purpose. While he was so engaged, Harkey left to obtain the services of Mrs. Leach as a witness.

Although mutual friends of the decedent and Harkey lived just across the road about 100 feet from the Harkey place and were available as disinterested witnesses to the will's execution, Harkey elected to drive two miles to pick up Mrs. Leach to serve in that capacity, notwithstanding that Day had not expressed himself concerning who were or were not to be attesting witnesses. The proponent explains his choice of Mrs. Leach as "due to the fact that Nels [a nickname for decedent] had more or less sworn me to secrecy on this Peeping Tom business and the fact he was leaving" and "I figured if I had Mr. Woodward [the nearest neighbor] he would have to know the whole story

\* \* \* so I happened to think of Mrs. Leach, a mutual friend."

When Harkey returned with Mrs. Leach, the lawyer informed him that the will was ready to sign, whereupon the proponent departed a few minutes later for Day. Upon his appearance shortly thereafter, Day met the lawyer for the first time. What then followed we take from the lawyer's testimony:

"\* \* \* I handed it to him and asked him to read the Will and see if it correctly expressed what he wanted in his Will. So he was standing there and he started reading it immediately and, oh, he read for not more than a few seconds when he said, 'Well, this is wrong right here,' and he pointed his hand to the portion where I had filled in his age. \* \* \* He said that was wrong. I told him, 'That is an error which can be corrected in your own handwriting and witnessed by us and we can take care of that.' He continued to read and he read for several minutes then when he completed it I asked him if it was correct and correctly expressed what he intended and wanted done, and he said yes, that it did. I stood up and told him that in order to make it legal it was necessary that he state he was going to sign this Will in the presence of us as witnesses and he was requesting us to witness his signature and sign ourselves, and he said he did. So we proceeded out from the dining room where we were out to the room on the end of the house and the first thing, as I recall, we did, he corrected the error in his age in that blank and he struck through the '2', in the figure '52', then he wrote at my direction, I told him to initial, then he wrote out 'M. R. Day' above. Then both Mrs. Leach and I initialed in the margin. Then we blotted it, turned it over and he proceeded to sign his name, then turned to Mrs. Leach and gave her the pen and she signed and she turned the pen to me and I signed. \* \* \*"

Then the attorney proceeded to place on the face of the instrument a pen-and-ink figure ''Z'' to indicate the non-use of that part of the printed form upon which the will was drawn. He continued: ''* * * then I folded the Will up and handed it to Mr. Day, then he turned and handed it to Mr. Harkey. * * *'' Harkey thereafter, at the decedent's request, handed the will to the lawyer for safekeeping.

The entire time thus consumed did not exceed ''ten or fifteen minutes'' which is explained in part by the lawyer's urge to keep his previously-made appointment. He left immediately after the execution of the will and without further conversation with Day. With the lawyer went the witness, Mrs. Leach, whom he let out at her home on his way back to Tillamook.

The events relating to the will took place in the Harkey living room in the presence of the lawyer and Mrs. Leach. The members of Harkey's immediate family were in an adjoining room separated only by an alcove from the room where the will was executed. During the entire time Day was in the Harkey home, he was never alone with the lawyer Harkey had retained for him, and the lawyer made no independent investigation concerning Day.

Day then returned to his home, never to be seen alive again. On the evening of the next day Harkey, disturbed by Day's absence, went with his neighbor, Woodward, to Day's cabin and, looking through the window, saw that Day was dead. His death was the result of a gun wound self-inflicted sometime after he had left Harkey's home.

■ In the recently-decided case of *Hill v. Henderson* (April 29, 1953), this court said:

''The burden of proof of undue influence is

ordinarily upon the party who asserts it and never shifts, but there may be circumstances when it is cast upon a beneficiary. Such is the rule when there is proof of the existence of a confidential relationship between the testator and the beneficiary, coupled with proof that the beneficiary actively participated in the will's preparation. Evident activity of that character casts upon the latter the burden of disproving undue influence. * * *"

■ A confidential relationship, as the words are used in the foregoing quotation from *Hill v. Henderson,* supra, and the citations relied upon in support thereof, means a fiduciary relationship, either legal or technical, wherein there is a confidence reposed on one side with a resulting superiority and influence on the other. It may be a moral, social, domestic or merely a personal relationship. *In re Estate of Urich,* 194 Or 429, 444, 242 P2d 204; *Allen v. Breding,* 181 Or 332, 342, 181 P2d 783; 57 Am Jur, Wills, 281, § 390.

We are persuaded that a confidential relationship existed between Day and Harkey, the sole beneficiary. Day lived alone. His nearest of kin were cousins and second cousins with whom he had infrequent contact, and then only with the few in the county who lived closest to him. He had learned to rely on his neighbors, and upon Harkey in particular, for advice in business matter with which he had little familiarity. He was distressed by his mother's recent death and confused about matters relating to the closing of her guardianship estate and the proper steps to be taken in the administration of her property after her demise. Harkey tells us that on the evening of their intimate conversation, closing with directions to prepare a will, Day declared, " 'You may not know it, Harkey, but you are the best friend I have got.' " Day's con-

duct not only gives substance to this assertion but does more. It demonstrates that Harkey was not only his "best friend" in Day's estimation but a friend in whom he reposed the highest degree of confidence, the one to whom he looked in the last analysis for persuasive advice and judgment and with whom he consulted on matters of his greatest agitation and concern.

It was to Harkey that he turned for counsel respecting his future course in the administration of his mother's estate. It was to Harkey that he looked for guidance as to the selection of an attorney to assist him in the proper performance of that duty, and it was a result of Harkey's suggestion that he chose Mr. McMinimee, with whom he expressed himself as being well pleased. It was Harkey to whom he made a confidential disclosure of his anxiety that he might become embroiled with the law as a result of his failure to make federal income tax returns for four previous years, and it was Harkey who undertook to make a confidential inquiry concerning Day's amenability to the law because of this delinquency. It was Harkey he took into his confidence under the pledge of secrecy when he made known his great hurt, anxiety and humiliation about the "Peeping Tom" rumors and his consequent determination to surreptitiously leave the community where he had always lived and go thence to parts unknown. Harkey was the man whose aid he invoked to assist him in the solemn task of preparing his last will and testament and to whom he looked to get a lawyer for that purpose. Harkey was selected as his agent to communicate to the lawyer the provisions which would enable Harkey to emerge as Day's sole beneficiary and executor. These matters confirm in us the belief that the relationship between Day and Harkey transcended

the concept of an ordinary friendship and translated it into one of a high trust and fiduciary character.

Once such a confidential relationship is shown to exist, slight evidence of additional facts may be sufficient to cast upon a beneficiary the burden of going forward to disprove that the will was not the product of that type of influence which the law abhors. *In re Estate of Urich*, supra, at page 445, and cases there cited. Even though ''Such a relationship does not of itself give rise to a presumption of undue influence, * * * it may be considered along with other supicious circumstances, and, so considered, may justify an inference of undue influence sufficiently to put upon the beneficiary the burden of proving that no undue influence was exercised in fact.'' *In re Estate of Meier*, 190 Or 140, 149, 224 P2d 572. Also see *In re Estate of Porter*, 192 Or 483, 490, 235 P2d 894; *In re Southman's Estate*, 178 Or 462, 482, 168 P2d 572.

It is also well established that where a confidential or fiduciary relationship exists between testator and beneficiary and the will is unjust or unnatural in its terms, by favoring the beneficiary over the natural objects of the testator's bounty, then *slight evidence* of the exercise of undue influence may be sufficient to invalidate it. *In re Rosenberg's Estate*, 196 Or 219, 246 P2d 858; *In re Estate of Meier*, supra, at page 150.

Bequests to the draftsman of a will have long been regarded as reprehensible in the eyes of the law. A will so drawn was by Roman law treated as invalid; and this court has held that when a will is drawn by a beneficiary who enjoys confidential relations with the testator, it gives rise to a presumption of undue influence. *In re Lobb's Will*, 177 Or 162, 188, 160 P2d 295. We think the same principle is equally applicable

when such a beneficiary chooses as the scrivener for a will an attorney who is a total stranger to the testator, who thereafter proceeds to draw the instrument without consultation or contact with the testator and who fashions it in terms directed by the beneficiary retaining the attorney in the testator's behalf.

There is here an amplitude of suspicious circumstances to justify an inference of undue influence. Those which are patently evident are: (1) The activity of the beneficiary, Harkey, in the preparation of the will. *In re Estate of Urich,* supra, 194 Or 446; *In re Estate of Meier,* supra, at page 149. (2) The secrecy and haste attendant upon the making of the will. *Sizemore v. Miller,* 196 Or 89, 247 P2d 224, 227; *Legler et al. v. Legler,* 187 Or 273, 315, 211 P2d 233; *In re Johnson's Estate,* 162 Or 97, 132, 91 P2d 330; *In re Rupert's Estate,* 152 Or 649, 681, 54 P2d 274. (3) The testator's failure to obtain disinterested or independent advice. *In re Estate of Urich,* supra, at page 446; *In re Lobb's Will,* supra, at page 188. (4) The total variance between the terms of the will which Day two days before had directed Mr. McMinimee to prepare and the terms of the will here challenged. *In re Rupert's Estate,* supra, at page 681. (5) Another circumstance that cannot be overlooked is the distressed and overwrought mental condition in which Harkey says he found Day when he called at his home on the evening of Day's self-destruction. According to the beneficiary, Day had attained such an emotional pitch as a result of the alleged "Peeping Tom" stories that he had not only resolved to abandon forever the familiar scenes of his lifetime but desired to rid himself of all his property before taking that contemplated, heroic and extreme step. Such a morbid state of mind

obviously exposed him to the influence and direction of another in whom he reposed great confidence. It is a circumstance that cannot be ignored. *In re Estate of Urich,* supra, at page 448. It is a factor which attains special cogency here when we recall that Harkey never confided the existence and causes of Day's mental distress to the lawyer who drew the will until after Day's death. It is to the credit of that attorney that he testified that had he known of Day's then mental condition, he would have made an independent investigation before drawing the contested will. It strongly suggests that had Harkey dealt more openly and less furtively with the counsel of his choice and had he encouraged the independent advice which Day, in his confused thinking, so sorely needed, possibly the impending tragedy would have been averted or deferred and this litigation never arisen.

In the foregoing enumeration of suspicious circumstances, it is worthy of note that we rely principally upon testimony of the will's proponent and sole beneficiary.

■ These matters, in our opinion, constitute more than slight evidence warranting an inference of undue influence and justifying the will's invalidation. *In re Estate of Urich,* supra; *In re Estate of Meier,* supra.

In the foregoing paragraphs of this opinion we have made frequent citation to Mr. Justice Tooze's recent holding in *In re Estate of Urich,* supra. A reading of that case in its entirety will reveal that in its basic and there persuasive facts, it is so like the instant matter that it can be appropriately said that the Urich case is controlling here.

The forthright manner in which the attorney who drew Day's will gave his testimony convinces us that

he was an innocent party to Harkey's self-interest and designs on Day's estate. We are persuaded that had Harkey not suppressed what he knew concerning the mental turmoil under which Day was then laboring, counsel's course would have been different in the premises. For these reasons we are not disposed to criticize him. The history of this transaction, nevertheless, justifies a word of admonishment to all who let haste or the urgency of other matters suffer them to relax the careful attention which the meticulous preparation of any will demands, be the estate large or small.

The negotiations and preparations looking forward to the drafting of a will are, as between attorney and client, of a delicate nature, fraught with far-reaching consequences. The lawyer employed for that service is required to draw heavily upon his experience and skill. The client, to achieve a result consonant with his plans and desires and invulnerable to afterattack, must repose the fullest faith and confidence in his chosen counsel and unhesitatingly make such disclosures to him as will insure that result. Their consultations should be in an atmosphere of such privacy that the prospective testator can enjoy the benefit of disinterested advice to an extent conducive of free and final judgments in the client devoid of the influence of any other person or the pressure of any greater haste than is absolutely necessary.

■ We are mindful that such occasions cannot always prevail to the extent that we have indicated, but only exceptional or unusual conditions of an emergency character should excuse a lawyer from diligent adherence thereto. When his services are sought in behalf of one planning the execution of a last testament by an

intermediary, particularly when such intermediary is to be named therein in any capacity, the lawyer should approach his responsibility with caution and, if possible, insist on a private interview with the testator named before submitting the drawn instrument for his review and possible execution. His duty in this respect becomes increasingly great when his services are engaged in another's behalf by one who is a stranger to the lawyer or when the potential testator is one whom the lawyer has not theretofore known. The importance of the fiduciary character of the bond which should ever prevail between an attorney and one planning the final disposition of his estate should never be suffered to be destroyed, tempered or diluted by the over-anxiety or self-interests of any third party who may benefit in any way by the will's execution, nor by any previously-existing relationship between the attorney and such a third party soliciting his services in behalf of one desirous of making a will. Although there is no suggestion here that the lawyer engaged was beholden to the person who called him, we think it is appropriate to observe also that drafting a last testament creates a moment in the life of a lawyer when there must be no question of divided loyalties. It is a challenge to his skill and understanding, calling into play the best and most cherished traditions of his profession.

The decree is affirmed.